### HALLER v. CITY OF LANSING.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—WIL-
FUL NEGLIGENCE.

It is only wilful and intentional negligence of an employee
that precludes recovery of compensation under the work-
men's compensation act.

2. SAME—COURSE OF EMPLOYMENT—NOON LUNCH HOUR.

The service tie or. contractual relation and obligation be-
tween master and servant is not broken by suspension
of all activities directly beneficial to the employer, as by
noon intermission for lunch.

3. SAME—DEATH—PERSONAL INJURY—COURSE OF EMPLOYMENT.

In proceedings for compensation for the death of an em-
ployee under the workmen's compensation act, where the
death was due to injuries sustained as the result of an
explosion of gas caused by deceased lighting his pipe,
upon going into the employer's tool house adjacent to
his work for better shelter from windy and inclement
weather, while eating his lunch at the noon hour, and
he was not prohibited by his employer from going into
the tool house at such time, held, that such employee was
within the act, and that compensation for his death was
properly allowed.[1]

Certiorari to Industrial Accident Board. Submitted
January 19, 1917. (Docket No. 29.)   Decided April
9, 1917.

Mrs. Mike Haller presented her claim for compen-
sation against the city of Lansing for the accidental
death of her husband in defendant's employ. From an
order awarding compensation, defendant brings cer-
tiorari. Affirmed.

*Joseph H. Dunnebacke*, for appellant.

*Thomas A. Lawler* and *John F. Berry*, for appellee.

[1] On application and effect of workmen's compensation act,
generally, see comprehensive note in L. R. A. 1916A, 23; particu-
larly as to injuries received in the course of employment, see
page 40 of above note.

195 Mich.—48.

STEERE, J.   The return of the industrial accident board to a writ of certiorari issued herein states that it made "no written findings of fact or law, or any decision in regard thereto, except such as is contained in Exhibit 8," which is a brief order, affirming the award of the committee on arbitration, made on October 9, 1915, finding that this claimant (plaintiff) was entitled to recover from respondent (defendant) the sum of $6.49 per week for a period of 300 weeks from the 29th day of October, 1913, for the accidental death of her husband, Mike Haller, on the 29th day of October, 1913, while in defendant's employ.   Various exhibits, copies of orders, etc., and the testimony taken before the committee on arbitration, compose the return.   Defendant asks reversal chiefly on the ground that the undisputed facts show the accident in question did not arise out of or in the course of deceased's employment because the injuries causing his death were received by him during the noon hour after work was suspended; were the result of his own act in striking a match to light his pipe, which was not a part of his employment, but, on the contrary, entirely foreign to it and outside its scope.   While other questions are raised and theories advanced in behalf of defendant, as the case is presented by this record we think the foregoing contention embodies the only proposition calling for serious consideration.

No question of dependency has been raised by defendant, and a fatal accident, at the time and place claimed, is not denied.   It is also admitted that at the time of the accident deceased was in defendant's employ as a common laborer, working with others at what is known as the East Side Park in said city.   Their work began at about 6:30 in the morning upon the date in question, and the usual time of suspending labor for an hour to take the noon meal was 11:30.

In connection with its street improvements the city

of Lansing owned a stone crusher plant, which was then located at East Side Park. Near the west side of the park was a small toolhouse used in connection with the crusher. On the day in question Mike Haller, the deceased, was working with others under a foreman on an elevation in the park some 60 or 70 feet from this toolhouse, engaged in leveling up or grading a place near the crusher for the purpose of receiving stone for paving operations of the following year, the work of paving having been suspended for that season. Haller, who was a Hungarian, had worked on the streets in defendant's employ for some time, but this was his first day at that work. Two acquaintances of his nationality were working there with him. The three Hungarians quit work with the others at near the noon hour when the foreman called the men from labor to take their midday meal. These men had brought their dinner with them as was their custom when working for the city. Of this the foreman under whom they worked testified:

"If they work at outside work they have to eat dinner wherever they can. * * * Wherever we were working they ate their dinner on the job, wherever it was; if on the street, grading or shoveling, they ate their dinner right there, unless some man happened to live close to the job; then he went home; most of them brought their dinners,"

—stating, however, that it was optional with them, as they had no instruction from the city in reference to it. The day was cloudy and cold, rendering it disagreeable to eat their dinners out of doors, and when work suspended for the noon intermission, the three Hungarians took their dinner pail and went to the toolhouse to eat. The toolhouse was used to store tools and equipment relating to the crusher, including oils, pails of grease, wrenches, pliers, blow torches, etc., and on this day there was a small amount of gasoline in a can under a work bench. The building was provided with

a telephone and a stove, resting on brick with a sand foundation. During the morning the foreman of the crusher had built a fire in the stove, and when he left for dinner there was a bed of coals in it, which he banked up with sand and ashes. He left the place unlocked, with the lock hanging in the staple. Very shortly after the three men entered the toolhouse there was an explosion and fire, which destroyed the building. In the explosion Haller received burns which caused his death a few days later.

Haller's two companions, who were not seriously hurt, were the only witnesses to the accident. They both testified that when the three entered the building Haller, who was ahead, seated himself upon a box, and was about to light his pipe when the explosion occurred. One of them, named Kicsak, testified through an interpreter:

"He says he don't know what really occurred. He was the third man in, and he just came—he came pretty near sitting down when the explosion came and all he saw, the man Mike was trying to smoke his pipe, and he keeled over. He was the last one, so he didn't realize really what it was. He said he saw Mike trying to light his pipe."

On cross-examination:

"Q. Ask him to tell how the fire started.
"A. He don't know how it happened.
"Q. Ask him if he was in the shanty when the fire took place—when it blazed.
"A. Sure. He says he went in there and saw him light the pipe, and just as soon as he saw the match just that soon he saw the flame."

The other man, named Popai, also examined through an interpreter, said:

"It was quite cold, and they went in to get their dinner. The other fellow went in first and then this man. They had their dinner in one pail and they boarded at the same place. The other fellow says,

'I am not going to eat, but I will light my pipe.' He lit the pipe, and the explosion came."

On cross-examination:

"*Q.* Ask him just what he means by an explosion and how it happened?

"*A.* He says all he knows, the fellow sat down there on a kind of a box or whatever might have been there, and took his pipe in his mouth and lit a match. . That is the only thing he knows."

Some slight, but we think incompetent, testimony, was introduced by defendant to the effect that shortly after the fire it was currently reported deceased had thrown a lighted match into a can of gasoline, and that he had endeavored to throw the contents of the can into the stove; that one or both of these men had so stated to a fellow countryman who interpreted it to the witness; one item of offered evidence was an anonymous letter written in Hungarian, purporting to tell how the accident occurred.

The two eyewitnesses denied any other facts, or knowledge, of the accident except as above stated, and consistently adhered, on direct and cross-examination, to the few graphic facts related by them as to what occurred. There is no evidence in the record which would warrant the accident board or this court in finding the facts otherwise.

These salient facts stand undisputed: Deceased was in defendant's employ, working as a common laborer by the day at outside work. He had brought his dinner with him to "eat on the job," and was there for the day on his employer's premises within the ambit of his employment. It was customary for the men so employed by defendant, at grading and shoveling, to eat their dinners there, wherever they were, at such a spot as they found most convenient and comfortable for that purpose. The day was cloudy, raw, and windy, and the men were working on an elevation. The tool-

house belonged to their employer, was conveniently adjacent, near the bottom of the rise where they were working, and but 60 or 70 feet away. It offered warmth and shelter from the wind, was accessible, and the men had not been forbidden to go there. No place had been provided or pointed out for them to take their meal. It was a natural and apparently innocent and safe thing for them to seek shelter there to eat their dinner on such a day. They had received no warning of occult dangers, were violating no rules and disobeying no orders in doing so. Under the shown facts the inference is strong that the accident resulted from an explosion of gas in the building ignited by deceased lighting his pipe. His negligence does not preclude recovery, unless it was wilful and intentional. There is nothing to show that it was, and the inference is that it was not. The fact that the actual consequences were serious raises no presumption of intentional or wilful misconduct, but rather the contrary. He was doing a natural and apparently innocent thing, which a workman while employed may reasonably do, especially at a time of intermission from active work. In *McLauchlan* v. *Anderson,* 1 Scot's Law Times (1911), 127, where a workman who was injured by falling from a wagon in an attempt to recover his pipe, which he had dropped, was held entitled to compensation because the injury arose out of and in the course of his employment, the court said:

"He was doing a thing which a man while working may reasonably do; a workman of his sort may reasonably smoke, he may reasonably drop his pipe, and he may reasonably pick it up again."

As directly applied to the noon intermission, it is a long and well-settled rule that the service tie, or contractual relations and obligations between master and servant, is not broken by such suspension of all activities directly beneficial to the employer.

"A workman is considered in the employment of his master during the intermission for the noon hour if he remains upon the premises." Baldwin on Pers. Injuries (2d Ed.), § 374.

This rule is more fully stated in 8 Thompson on Negligence, § 3752, as follows:

"A servant is deemed in his master's service whenever present to perform his duties and subject to orders, though at the given moment he may not be actually engaged in the performance of any given work; thus the relation exists during the noon hour where the master especially and expressly or by fair implication invites his servant to remain on the premises and lunch in the immediate vicinity of his work."

Agreeably to that rule, it is generally held under workmen's compensation laws that, while such relation so continues, an injury to an employee may arise out of and in the course of his employment, although he is not directly engaged in the work of his employment at the time. *Von Ette's Case*, 223 Mass. 56 (111 N. E. 696, L. R. A. 1916D, 641). In that case the court sustained an award of the industrial accident board to an employee injured by falling from the roof of the building in which he was working, where he had temporarily gone to get fresh air and relief from the heat below.

The general rule as to injuries during intermissions from labor, especially where the accident occurs on the employer's premises, is formulated from the decisions as follows in 1 Honnold on Workmen's Compensation, p. 381:

"Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the workmen's compensation acts, though they are only indirectly conducive to the purpose of the employment. Consequently no break

in the employment is caused by the mere fact that the workman is ministering to his comforts or necessities, as by warming himself, or seeking shelter, or by leaving his work to relieve nature, or to procure a drink, refreshments, food, or fresh air, or to rest in the shade" (citing numerous sustaining cases).

In *Morris* v. *Lambeth Borough Council*, 8 W. C. C. 1 (somewhat analogous in its facts to this case), where a night watchman, who left his station and went to cook and eat his food in a small shanty near by used for storing tools, where workmen sometimes ate in the daytime, and while there cooking a chop, was injured by the shanty falling down, it was held that he had suffered an accidental injury arising out of and in the course of his employment.

In *Carinduff* v. *Gilmore*, 7 B. W. C. C. 981, a girl employed on a threshing machine was held not outside of her employment where she had seated herself to partake of refreshments in a position on the opposite side of an opening through which sheaves passed into the machine and was injured while arising.

Counsel cite as controlling precedents in this State *Moronen* v. *McDonnell*, 177 Mich. 691 (143 N. W. 8) and *Hills* v. *Blair*, 182 Mich. 20 (148 N. W. 243). The *Moronen Case* was an action for negligence, not under the workmen's compensation act, and all the common-law defenses of assumption of risk, negligence of a fellow servant, and contributory negligence were open to defendant. During the noon hour blasting was done where the men worked. They were expected to withdraw to a place of safety during that time, and warnings were called whenever blasts were about to be fired. Plaintiff with others had withdrawn to eat their dinner at what they regarded as a safe place and distance. They were at liberty for the noon hour, knew of the dangerous operations in progress at the place they had been working, were free to go where and as far as they pleased. They were not at the place of

their employment when plaintiff was injured or on the premises, but some distance away, at a location of their own selection beyond a small hill, sitting beside the highway. The distinguishing facts in the *Hills Case* are that when injured he was not at the place of his employment, where he usually ate his dinner with his foreman and fellow laborers, but had left that locality and its environments and was on his way home, free to go where and by any route he pleased, in the same position as any other member of the public so traveling, and while thus away on an errand of his own, with a choice between known dangerous and safe routes, he took the dangerous one.

From an examination of cases cited by defendant, and others we have examined in which it has been held that an employee injured on the premises of his employer during the noon hour or other temporary suspension of work was not under the act, we think it manifest that the controlling reason for denying an award in those cases rests upon the proven facts that the employee broke the so-called nexus between workman and employer by some manifestly reckless and unreasonable hazard, amounting to intentional and wilful misconduct, or by disregarding, or disobeying, some warning of danger at the place of injury or prohibition relating to the thing being done, either addressed to the workman or promulgated as a general rule of conduct while on the premises. We think the following two cases, respectively relied upon by the contending parties, illustrate this evident distinction:

In *Blovelt* v. *Sawyer*, 6 W. C. C. 16, cited by plaintiff, a bricklayer who was paid according to the number of hours he actually worked, at liberty to remain upon the premises to eat his dinner or not as he saw fit, sat down at the noon hour under the shelter of a wall which he was engaged in building, and, while eating his dinner there, was seriously injured by the wall

falling upon him. It was shown that the workmen employed on this building generally went away for dinner, but there was no absolute rule upon the subject, and they might spend the noon hour there if they wished. The court there said that, even though he was paid by the hour, the intermission for dinner could be regarded "as part of the time allowed for some purpose ancillary to the work to be done, as, for example, eating the necessary food; it would be taking a strained view to say that the pause in the middle of the work for dinner was a break in the employment." It was accordingly held that he was within the act and entitled to compensation under its provisions.

In *Price* v. *Edward Lloyd*, 2 B. W. C. C. 26, cited by defendant, a workman on a night shift went some distance from where he was at work to a pumping station on his employer's premises and climbed upon a warm tank where he sat to eat his supper. In getting down from the tank he fell through an aperture in it and was scalded, receiving injuries from which he died. It was shown that his employers had provided upon their premises, also some distance from where deceased worked, a well-warmed and well-lighted dining room for their workmen. They were not obliged to eat their meals in this dining room, but it was there for their comfort and convenience. It was shown that the chief engineer and chief stoker were the only persons entitled to deal with this tank in any way, and that if deceased had been reported for going where he did, he would have been discharged. Differentiating this case from *Blovelt* v. *Sawyer, supra,* and *Morris* v. *Lambeth, supra,* in holding the accident did not arise out of his employment, it was said in part:

"In our opinion the workman, in needlessly exposing himself to risk, met with an accident which can in no sense be said to have arisen out of his employ-

ment.  *  *  *  A workman's employment is not con-
fined to the actual work upon which he is engaged,
but extends to those actions which by the terms of his
employment he is entitled to take, or where by the
terms of his employment he is taking his meals on
the employer's premises. But the employment does
not extend to the doing of those things which are un-
reasonable or which he is expressly forbidden to do.
Here the workman was doing what he was forbidden
to do by the employers, not expressly, but in the sense
that he was doing that which was not allowed.  It
was a highly dangerous thing to do, and the evidence
was that if it were known that a workman had done
it, he would have been dismissed."

The distinction pointed out is that the workman
went where he knew, or ought to have known, he
should not be, and was injured in doing a forbidden
and manifestly highly dangerous thing, having of his
own choice incurred an evident and unnecessary risk,
external to his employment, in a prohibited place.

In the instant case the record is barren of any proof
deceased knew that gasoline was in the toolhouse, that
it was liable to vaporize and explode, or that the
place was in any way dangerous.  The building was
unlocked and free of access, with no warning signs,
was on his employer's premises invitingly close to
where he was working in the inclement weather.  As
before stated, in seeking shelter there during the noon
intermission, he did a reasonable and natural thing
under existing conditions, might reasonably light his
pipe at such a time, was doing no forbidden thing, in-
curring no apparent risk, and violating no known rule
of his employment.  We think there is evidence in the
case to sustain the conclusion of the board that he was
within, and entitled to compensation under, the act.

Its order is therefore affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE,
BROOKE, and FELLOWS, JJ., concurred.