SALMON *v*. BAGLEY LAUNDRY COMPANY.

1. WORKMEN'S COMPENSATION—PLACE OF INJURY—PROXIMATE CAUSE.
    The test of whether an injury to an employee is compensable un- . der the workmen's compensation act is not whether the injury arose on or off the premises but whether the employee was within the ambit of his employment and whether there was a causal connection between the injury and the employment.

2. SAME—PROXIMATE CAUSE.
    An industrial injury is compensable under the workmen's compensation act only when the injury is received while the employee is doing the duty he is employed to perform and is a natural incident of the work.

3. MASTER AND SERVANT—RIGHT TO CONTROL.
    The right to control or direct an employee is an essential element in determining whether the relationship of employer and employee exists, irrespective of whether it is in fact exercised.

4. WORKMEN'S COMPENSATION—INJURY DURING COFFEE BREAK—CONTROL—PAYMENT.
    Laundry worker *held,* not entitled to workmen's compensation for injuries sustained when she slipped on laundry's icy steps while returning from restaurant during 10-minute so-called coffee break during which her employer had no control over her actions and she was not actively engaged in rendering a service to the employer; the fact that she was paid for such period having no bearing upon whether her injury arose out of and during the course of her employment.

BUTZEL and SMITH, JJ., dissenting.

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Workmen's Compensation §§ 197, 198, 214.
[2] 58 Am Jur, Workmen's Compensation § 198.
[3] 35 Am Jur, Master and Servant § 3.
[4] 58 Am Jur, Workmen's Compensation § 214 *et seq.*

Appeal from Workmen's Compensation Commission. Submitted October 4, 1955. (Docket No. 14, Calendar No. 46,345.) Decided December 28, 1955. Rehearing denied March 1, 1956.

Micaela Salmon presented her claim against Bagley Laundry Company, employer, and American Casualty Company, insurer, for compensation following injuries sustained when she slipped on icy step during recess for coffee. Award to plaintiff. Defendants appeal. Reversed and remanded.

*Charfoos, Gussin, Weinstein & Kroll* (*Charles H. King,* of counsel on application for rehearing), for plaintiff.

*Lacey, Jones & Doelle* (*Buell Doelle,* of counsel), for defendants.

SHARPE, J. Upon leave being granted, defendants appeal from an award of the workmen's compensation commission in which it was determined that plaintiff is entitled to compensation at the rate of $18.67 a week from January 16, 1951, until the further order of the commission. The essential facts are not in dispute. Plaintiff was employed by defendant company. Her job was to feed clothes into a mangle and fold them when they came out. Plaintiff and her family lived upstairs over the laundry at the time of her injury.

Prior to plaintiff's injury, a contract was negotiated by the union representing the laundry employees providing for a rest period of 10 minutes each morning and afternoon, during which time employees were permitted to leave the laundry for a so-called coffee break. When the coffee-break period was arrived at a whistle would blow and the employees could go out for coffee or minister to

his or her own personal wants. No deduction of wage was made during this period. On the day in question plaintiff began work at 8 a.m., and worked until the morning rest period commencing at 9:20 a.m. Plaintiff and other employees went to a nearby restaurant where plaintiff had coffee. On leaving the laundry, plaintiff noticed some ice on the step at the front door of the laundry. The step protruded about 2-1/2 feet into the public sidewalk. Upon return from the restaurant, and on ascending the step outside the front door of the laundry, plaintiff slipped and injured her left wrist. In an opinion the commission held:

"It is our opinion that plaintiff sustained an accidental injury while performing an act which was beneficial to her employer, incident to and within the ambit of her employment and conclusive of the proposition that her injury arose out of and in the course of her employment."

Prior to the inauguration of the 10-minute rest period, the employees were permitted at their own discretion, with the consent of the employer, to go out of the laundry to get coffee and sandwiches, as the laundry did not provide such facilities. One of the purposes, and the main purpose in selecting a particular time for the rest period, was to eliminate the confusion of employees leaving the laundry at irregular periods. We note that under the so-called coffee break, the employee was not required to go out for coffee. The employees could do anything they wished during that period or they could merely rest if that was their wish.

Defendants urge that under the circumstances of this case plaintiff did not suffer an accident arising out of her employment. Our Court adheres to the rule laid down in *Daniel* v. *Murray Corporation of America,* 326 Mich 1, 12, 13, where we said:

"In this State the test that has been followed is whether the employee, regardless of where his injury arose, either on or off the premises of his employer, was injured while within the ambit of his employment, and whether there was a causal connection between the injury and the employment. The primary test under our statute is not *where* the injury occurred, but whether his injury arose out of and in the course of his employment."

The law is well settled that an industrial injury is compensable only when the injury is received while the employee is doing the duty he is employed to perform, and as a natural incident of the work, see *Associated Oil Co.* v. *Industrial Accident Commission,* 191 Cal 557 (217 P 744), cited with approval in *Tegels* v. *Kaiser-Frazer Corp.,* 329 Mich 84. In the *Tegels Case,* above cited, plaintiff brought compensation proceedings against his employer to recover for injuries sustained while attending a union meeting at his employer's factory for the purpose of electing a shop steward. The meeting was held during the lunch period and at a time when plaintiff was not being paid. We there held that the injury did not arise out of or in the course of plaintiff's employment. We there said (p 90):

"In the case at bar plaintiff was not actively engaged in rendering a service to his employer at the time of his injury. He was exercising a privilege common to all members of the union in the selection of a steward. It cannot be said that his injury arose out of and in the course of his employment."

The right to control or direct an employee is an essential element in determining whether the relationship of employer and employee exists. In *Tuttle* v. *Embury-Martin Lumber Co.,* 192 Mich 385 (Ann Cas 1918C, 664), we held that the test of the relationship is the right to control, whether in fact exercised or not. See, also, *Dennis* v. *Sinclair Lum-*

*ber & Fuel Co.*, 242 Mich 89, and *Janofski* v. *Federal Land Bank*, 302 Mich 124. In cases involving independent contractors the right to direct or control is absent. In the case at bar, as in the *Tegels Case*, *supra*, the right to control the actions or activities of the employees during the noon hour lunch period or coffee-break period was absent. In the instant case plaintiff had the option of leaving the laundry for coffee or remaining within the building for a rest period. During this period her employer had no control over her actions, nor can it be said that she was actively engaged in rendering a service to her employer. The fact that she was paid during this 10-minute interval has no bearing upon whether her injury arose out of and during the course of her employment. During this period plaintiff was exercising a privilege common to all employees of the defendant company. The facts in this case do not warrant a finding that her injury arose out of and during the course of her employment.

The order of the workmen's compensation commission is reversed and the cause remanded for entry of an order denying compensation. Defendants may recover costs.

CARR, C. J., and BOYLES, REID, DETHMERS, and KELLY, JJ., concurred with SHARPE, J.

SMITH, J. (*dissenting*). Again we are construing the great remedial statute, the workmen's compensation act. In this case a laundry employee was injured. It happened on her employer's premises during the working day. Returning from a so-called "coffee break," she slipped and fell on ice which had been allowed to accumulate on the front steps of the laundry.

It is my Brother's opinion that her award by the workmen's compensation commission is in error and

that its order should be reversed. His opinion turns on the concept of control. "The right to control or direct an employee," it tells us, "is an essential element in determining whether the relationship of employer and employee exists." He scales the facts before us alongside this essential element: "In the case at bar   *   *   *   the right to control the actions or activities of the employee during the noon hour lunch period or coffee-break period was absent." The conclusion follows inexorably: "The facts in this case do not warrant a finding that her injury arose out of and during the course of her employment." Obviously, then, she cannot recover.

Yet even at the common law, with all of its rigors, and with all its doctrines of sanctuary available to the employer (contributory negligence, assumption of risk, fellow servant rule, and so forth), employees have recovered damages in this type of case, where it could be said that the employee had not been furnished a safe place to work. The cases involving slipping and falls by employees are collected, in part, in 7 NCCA 596, and 38 NCCA 213. In this case, however, under the liberal provisions of an humanitarian statute, the employee finds herself in a worse position than have many under the common law. Can this be the law?

I say not. In my opinion she is clearly entitled to her recovery.

The fundamental issue posed by this simple case is so sweeping that we may be justified in casting a glance backward before we begin to appraise the present. It was the combination of the mechanization of industry and the development of the corporate device which brought together large masses of people and great pools of capital. As a result, we have been showered with blessings of a material nature. But it must never be forgotten that there is a poor relation in the back room, a tragic by-product of our

progress, the injured worker, sometimes grotesque, sometimes severely crippled. His number is appalling. Somers' recent treatise "Workmen's Compensation" contains in readily available form the summaries, respecting disabling work injuries, of the United States bureau of labor statistics, expressed by the authors in the following language (p 2):

"Another way of putting it would be that 1 American worker will have been killed or crippled every 3 minutes. Another will have been injured every 11 seconds.

"Multiply the daily casualty list by the 260 days which constitute an average American work year and you arrive at the annual human toll which modern industry exacts: about 16,000 fatalities, 91,000 permanent disabilities—of which some 1,600 are 'total,' such as paraplegia, broken backs, blindness, or double amputations, the others representing loss, or loss of use of, an arm, a leg, an eye, a finger or a part thereof—and nearly 2 million temporary disabilities."

What have we done about this injured worker? It is clear what we have done. First of all, we no longer shoulder him aside and leave him to his own devices. Rejected also is the theory of the handout. What we have given him is called "compensation," which, though modest, was to be certain and speedy, and the reason we gave it was because of widespread dissatisfaction with the application of common-law tort theories to the injuries of workmen. The common law, in truth, was almost completely helpless to meet the challenge of the industrial age. "To speak of the common-law personal injury action as a remedy for the problem is to jest with serious subjects, to give a stone to one who asks for bread," said the supreme court of Wisconsin in *Borgnis* v. *Falk Company,* 147 Wis 327, 348 (133 NW 209, 37 LRA NS 489). Why was the common law helpless

in this situation? Largely because the courts looked to tort concepts, developed in strikingly dissimilar situations, for precedent. At the risk of oversimplifying a most complex matter we observe that both fault and negligence, in the ordinary tort law sought to be applied by the early courts, were personal. How, then, could the employer be forced to answer for the injury? He (as distinguished from the early master who worked shoulder to shoulder with his apprentice and servant) usually was not even in the plant at the time of the injury. Thus it was often said to be the fault of the workman at the next machine (fellow-servant rule) and, hence, the master was not liable. Other tort formulae, equally inappropriate, were utilized. But the most striking example of how a legal doctrine formulated to meet one situation could become a bizarre monstrosity when applied to another was the tort doctrine of contributary negligence. There is no need here to trace its growth. It served a purpose at a time in our legal history. But applied to this totally foreign situation it provided the most reckless employers with a complete shield against liability, since (reasoned the common law) the employee was simply a fool to work in a place obviously so dangerous. Therefore, he himself was in part to blame for his injury (contributory negligence). And, of course, continued the common law, he having contributed to his own injury could not force the other party (his employer) to pay damages for the hurt. It could even be argued that, with his eyes open, he had "assumed the risk" of his injury. Thus it furnished the employer with a built-in defense, an automatic absolution, for the worse the plant the less the chance he would be forced to pay damages.

"Indeed, it is a common thing for an employer, in defense of an action for damages brought by his

employee for injury received in such a situation, to urge that the dangers of the place were so obvious and apparent that the employee was guilty of contributory negligence for working therein." *State, ex rel. Davis-Smith Co.*, v. *Clausen,* 65 Wash 156, 208 (117 P 1101, 37 LRA NS 466).

Obviously, no people interested in its survival could long countenance the continuation of such sophistry. The pressures increased, well described in 1 Honnold, Workmen's Compensation, chap 1. Presidential messages to the congress reflected the national distress. See 41 Cong Rec 22, 26. One of the clearest expositions of the necessity for the passage of the compensation acts, and their purposes, may be found in a message of President Theodore Roosevelt to the Congress in 1907, it reading, in part, as follows (42 Cong Rec 67, 73):

"The law should be made such that the payment for accidents by the employer would be automatic instead of being a matter for lawsuits. Workmen should receive certain and definite compensation for all accidents in industry irrespective of negligence. The employer is the agent of the public and on his own responsibility and for his own profit he serves the public. When he starts in motion agencies which create risks for others, he should take all the ordinary and extraordinary risks involved; and the risk he thus at the moment assumes will ultimately be assumed, as it ought to be, by the general public. Only in this way can the shock of the accident be diffused, instead of falling upon the man or woman least able to bear it, as is now the case. The community at large should share the burdens as well as the benefits of industry. By the proposed law, employers would gain a desirable certainty of obligation and get rid of litigation to determine it, while the workman and his family would be relieved from a crushing load."

The supreme court of the State of Washington, speaking in *Stertz* v. *Industrial Insurance Commission,* 91 Wash 588 (158 P 256, Ann Cas 1918B, 354) described the need in these words:

"The workmen wanted a system entirely new. It is but fair to admit that they had become impatient with courts of law. They knew, and both economists and progressive jurists were pointing out, what is now generally conceded, that 2 generations ought never to have suffered from the baleful judgments of Abinger and Shaw."

(It was Lord Abinger who enunciated the fellow-servant rule in *Priestley* v. *Fowler,* 3 M&W 1 [150 Eng Rep 1030] and Justice Shaw of Massachusetts, who, in *Farwell* v. *Boston & Worcester R. Corp.* [1842], 4 Metc [45 Mass] 49 "popularized the defense of assumption of risk." [1 Larson's Workmen's Compensation Law, § 5.10])

The atmosphere, in brief, was one of sorrow and frustration. The industrial revolution had arrived and with it had come mechanization. But the machine was as contemptuous of human flesh as it was of impersonal steel. The face of the courts was turned, turned by what was thought to be precedent and *stare decisis.* Our sons cried out.

Our answer was given in the form of the great workmen's compensation acts, humanitarian measures which, all courts agree, are to be construed liberally (*e. g., Adkins* v. *Rives Plating Corp.,* 338 Mich 265) to accomplish their healing mission of solace and relief. They were, as the supreme court of Iowa put it (*Heiliger* v. *City of Sheldon,* 236 Iowa 146, 161 [18 NW2d 182]), "a complete departure from the common law with respect to liability for injury." Far from being merely an amendment of the common law, said the court, they were "a revolt therefrom and the creation of a complete

substitute therefor and not a mere improvement therein."

These acts, it was thought, would eliminate the difficulty and hardship in proving the workman's case, "the great waste in procuring a recovery, the delay in obtaining the relief, the uncertainty often-times in determining the cause of the accident." *Powers* v. *Hotel Bond Co.,* 89 Conn 143, 146 (93 A 245). They would do this "by the taking away and removal of certain defenses." (*Adams* v. *Acme White Lead & Color Works,* 182 Mich 157, 161 [LRA1916 A, 283, 6 NCCA 482, Ann Cas 1916D, 689]), and they would thus "afford relief from evils and defects which had developed under the old rules of law in negligence cases for personal injuries of employees," *Mackin* v. *Detroit-Timkin Axle Company,* 187 Mich 8, 13. The workingman, accordingly, was to be assured of recovery for injuries received at his work. He would not receive a large award. Nothing would be allowed, for instance, for pain and suffering, but at least it would be speedy and certain. Or so it was thought.

The acts, however, in their administration and results, have not lived up to the great hopes expressed for them. A flood of litigation has resulted. Horovitz, writing in 3 NACCA 15, notes:

"For a judge, lawyer, or layman to try to read all the cases coming down annually in workmen's compensation cases alone is an almost impossible task, even when limited to written decisions of the highest courts and intermediate courts. Add to these over 100,000 hearings and conferences before administrative tribunals and it is clear no human being can attempt to read or keep up with all the nation-wide compensation rulings."

And further (p 17):

"Workmen's compensation can no longer be ignored as a minor field of law. It is now the largest

casualty insurance in the world, and has become a
$600,000,000 annual business."

One of the most prolific sources of this mass of
litigation is the effort to read into the act definitions
and concepts taken from the field of torts. This is
not a tort field. The tort concepts cannot cope with
it. As well try to compute the equations of nuclear
physics on an abacus. This case is an illuminating
example. How is it possible, under an act passed
"to ameliorate a social condition—not to define a
situation or fix a liability by adherence to the old
common law,"* an act to be construed both reason-
ably and liberally, how is it possible that the laun-
dress before us, injured on the employer's premises
during the working day, in an activity sanctioned
by contract and paid for by her employer, can find
herself without recovery? In reply we are told that
the employer lacked "control" over her at the time
she was hurt.

From whence comes this requirement of "con-
trol"? There is nothing in the act fixing liability
in such terms. It comes from the law of torts. It
is blood brother to contributory negligence, assump-
tion of risk, the fellow-servant rule and the other
tort concepts which were utilized so effectively in
the common-law courts to bar employees' recovery;
so effectively, in fact, that this act was passed in
response to peremptory and overwhelming public
demand. I cannot agree that we should import this
tort concept into this great remedial statute. It
is foreign to the purposes of the act. It was formu-
lated and utilized in the tort law as a means for
determining the liability of an employer to some
third person. See Stevens, The Test of the Employ-
ment Relation, 38 Mich LR 188, and cases there
cited. It had its roots in the idea of command, ex-

* *Verschleiser* v. *Stern & Son*, 229 NY 192, 199 (128 NE 126).

press or implied. The theory, very generally, was that if the master "commanded" the tort (*i.e.,* "controlled" the tort-feasor) he should respond in damages for it.

But why use it here? If it has any justification at all in its own field, and this is far from conceded, its purpose is to determine whether an employer should be liable to some third person, such as a pedestrian who is injured by a truck of the employer, driven by his employee. But our question does not involve the employer's liability to any third person. It is simply a question of whether one man works for another within the meaning of this act. It does not involve an injury *by* an employee, but one *to* the employee, an injury inflicted or suffered in the production of goods or services.

It is from this latter phrase, "the production of goods and services" that we are led to the theory behind the act. Its intent, and the spirit behind its passage were made clear by us in *Mackin* v. *Detroit-Timkin Axle Company, supra,* 13, when we pointed out that:

"It is to be recognized at the outset that workmen's compensation legislation of this class, based on the economic principle of trade risk in that personal injury losses incident to industrial pursuits are, like wages and breakage of machinery, a part of the cost of production, works fundamental changes in the familiar principles underlying and governing the doctrine of liability for negligence as heretofore applied to the relation of master and servant."

The theory of the act, then, is that the cost of the product must bear the expense of injury in its manufacture. The loss will, in part at least, be passed on to the ultimate consumer, "not because the consumer is at fault," as Learned Hand, J., said in *Grain Handling Co.* v. *Sweeney* (CCA), 102 F2d

464, 465, "but because a loss shared among many is less a loss than if borne by one."

The tort concept of control is completely out of place under this theory. It may be very simply tested. Let us consider a situation in which the employer cannot conceivably control the details of an employee's performance of his work. Thus a physician and surgeon is hired as a full-time employee. For obvious reasons the board of directors will have no control of his work of diagnosis and treatment, or the surgery he is called upon to perform. The board's control can be only peripheral concerned with the place he is to work (in the plant), the hours he is to work (while the plant is working) and such housekeeping details. Yet, if the physician is injured at his work, in the course of his employment (a boiler explodes, the roof collapses) his right to compensation is clear. *West Virginia Coal & Coke Corporation* v. *State Compensation Commissioner,* 116 W Va 701 (182 SE 826). The reason is because his work is an integral part of the manufacturing operation as here performed and because he is subject to its hazards. That is how he got hurt and that is why the product should bear the cost of his injury. All of this has nothing to do with "control." So it is that we find the supreme court of the United States completely rejecting the so-called "control" test of employment in a workmen's compensation case:

"Indeed, to import all the common-law concepts of control and to erect them as the sole or prime guide for the deputy commissioner in cases of this nature would be to encumber his duties with all the technicalities and unrealities which have marked the use of those concepts in other fields." *Cardillo* v. *Liberty Mutual Ins. Co.,* 330 US 469, 481 (67 S Ct 801, 91 L ed 1028).

What are these technicalities and unrealities?
Consider the application of the control test to the
facts before us. The claimant, when she came to work
that morning, was concededly an employee. As such,
in the normal situation, and we find nothing in this
record to indicate otherwise, she comes to work when
the employer says to come. She goes when he says
to go. She stops at his command. She performs
her routine tasks as he directs them to be performed.
If her work is unsatisfactory, or business is "slack"
she is free, even requested, to seek employment else-
where. She is dependent, economically, upon her
wage, and she earns it from her employer by doing
his bidding. In all of this I find complete control, if
we require such. Now, when did this control cease?
When she went for coffee? (Even the mechanics of
the coffee break, as we gather them from the record,
demonstrate the plenary control exercised. A whis-
tle blew. Production stopped. The machines were
shut down. The front door was thrown open [in
the winter] and those who wished went for coffee.
Another whistle, the doors were closed, and the rest
period was at a close. I have difficulty in saying
that all of this is not control. Even from whistle
to whistle there is at least a smell of control.)

To repeat, there was indisputably an employment
relation until the coffee whistle blew. All tests, even
control, could lead only to such conclusion. Was this
employment relation suspended at the blast of the
whistle because of lack of "control"?

If so, it is well to observe that we have, throughout
the working day, not continuous employment, but
a checkerboard of legal relationships. The work-
man comes to his job. At that point he is an em-
ployee. He turns from the lathe to blow his nose.
Plainly the board of directors does not "control"
this operation. He is no longer an employee. He
returns to the work assigned. Once again he is an

employee. He goes to the toilet. He returns. He takes the coffee break. Again, he loses his employment status.

I must reject the checkerboard resulting from the application of the control concept. It must be apparent that the answer to our problem is not to be found in the ancient and dubious concept of control, lifted from the law of torts. The workmen's compensation act is not to be construed "as substituting a statutory tort for a common-law tort." Brandeis, J., in *Bradford Electric Light Co., Inc.,* v. *Clapper,* 286 US 145, 158 (52 S Ct 571, 76 L ed 1026, 82 LRA 696). As a matter of fact, as Justice Potter of our Court said in *Hebert* v. *Ford Motor Co.,* 285 Mich 607, 610:

"Most of the difficulties now encountered in the administration of the workmen's compensation act arise from injudicious attempts, sometimes acquiesced in, to engraft upon the workmen's compensation act common-law theories at variance with its spirit and intent."

The answer is to be found in the act itself, construed in the light of its purpose as above set forth. The act provides, very simply, that injuries suffered in the course of employment be recompensed. (The act, it will be noted, does not speak of the "scope" of employment. That again, is the language of torts.) Do, then, the words "course of employment" include the coffee break described?

The question can, consistently with the purpose of the act, as described in *Mackin* v. *Detroit-Timkin Axle Company, supra,* be answered only in the affirmative. The manufacture of the product involves a series of casualties and deaths. The cost of the product must bear the burden, thus spreading the burden among the consumers rather than concentrating it on the helpless family unit involved. The words

"course of employment" in our act include the coffee break simply because the product, which must shoulder the burdens of injuries in its manufacture, is made by a human being. He brings to his work all of his human characteristics, his frailties as well as his virtues. We cannot, either actually or legally, make the precise excisions of the surgeon. We cannot remove from him, and put to work for his employer, only his strength. His strength goes hand in hand with his temper. It is impossible for us to employ only the grace and charm of the female worker. We hire as well her lively curiosity. We collect these people by the hundreds, even thousands, and we put them to work, sometimes amid noise and vibration, sometimes in smoke and steam. They get tired. They get hungry. They get thirsty. They have to go to the toilet. The day wears on and tempers grow short. Relief is sought in horseplay. Trips to the water cooler and coffee urn grow in number and duration. This is the course of employment. "Course of employment" is not a sterile form of words. It is descriptive of life in the industrial age. These human deviations from the course of the automaton do not suspend the employer-employee relationship. They are not departures from employment, but the very substance of it. They are the inevitable concomitants of the working relationship and conditions which produce the product. Its cost must reflect the fatigue, the irritations, and sometimes the blood that went into it. It is here that we find the explanation for the horseplay cases, the curiosity cases, and the assault cases. Such problem will cease with the arrival of automation.

I take it to be clear, then, that the course of employment of a human being (at least in the modern cases, as we have progressed from the "baleful influence of Abinger and Shaw") includes not only his repetitive acts at the machine to which he is

assigned, but includes, as well, his ministrations to his human needs. Some courts have explained these cases on the theory of "indirect benefit" to the employer, since an uncomfortable employee does not efficiently serve his employer, some on the theory of mutual benefit, since the gratification of the need is also a solace to the worker. Recovery in this case, the record makes clear, could be rested on either of these grounds as appears from the background of the contractual provisions concerning the coffee break:

"Prior to the time that we arrived at what I think is a pretty definite understanding as to where they could go, the employees would, some who lived near the laundry would actually go home, others would have a car available, get in a car and go somewhere else, and it was that kind of abuse of this privilege of leaving the plant for several minutes that led up to the fact that as far as they could go, would be able to go, would be to this particular restaurant, and they were not permitted for this period of coffee time to go either to their homes, to drive away from the plant or to go to other places in the nearby vicinity."

Our decision, however, should not be grounded upon the benefit theory since there is a more fundamental principle involved. It is well described in one of our early decisions. In the case of *Haller* v. *City of Lansing*, 195 Mich 753, 758–760 (LRA1917E, 324), a claim arose out of an employee's accidental death from injuries suffered on his employer's premises during his lunch hour. (He caused an explosion by lighting his pipe.) In approving the compensation awarded we said, in part:

"He was doing a natural and apparently innocent thing, which a workman while employed may reasonably do, especially at a time of intermission from active work. In *McLauchlan* v. *Anderson*, 1 Scots

Law Times (1911) 127 (4 BWCC 376), where a workman who was injured by falling from a wagon in an attempt to recover his pipe, which he had dropped, was held entitled to compensation because the injury arose out of and in the course of his employment, the court said:

"'He was doing a thing which a man while working may reasonably do; a workman of his sort may reasonably smoke, he may reasonably drop his pipe, and he may reasonably pick it up again.'

"As directly applied to the noon intermission, it is a long and well-settled rule that the service tie, or contractual relations and obligations between master and servant, is not broken by such suspension of all activities beneficial to the employer.

"'A workman is considered in the employment of his master during the intermission for the noon hour if he remains upon the premises.' Baldwin, Personal Injuries (2d ed), § 374.

"This rule is more fully stated in 8 Thompson on Negligence, § 3752, as follows:

"'A servant is deemed in his master's service whenever present to perform his duties and subject to orders, though at the given moment he may not be actually engaged in the performance of any given work; thus the relation exists during the noon hour where the master especially and expressly or by fair implication invites his servant to remain on the premises and lunch in the immediate vicinity of his work.'

"Agreeably to that rule, it is generally held under workmen's compensation laws that, while such relation so continues, an injury to an employee may arise out of and in the course of his employment, although he is not directly engaged in the work of his employment at the time. *Von Ette's Case*, 223 Mass 56 (111 NE 696, LRA1916D, 641). In that case the court sustained an award of the industrial accident board to an employee injured by falling from the roof of the building in which he was work-

ing, where he had temporarily gone to get fresh air and relief from the heat below.

"The general rule as to injuries during intermissions from labor, especially where the accident occurs on the employer's premises, is formulated from the decisions as follows in 1 Honnold on Workmen's Compensation, pp 381–384:

" 'Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the workmen's compensation acts, though they are only indirectly conducive to the purpose of the employment. Consequently no break in the employment is caused by the mere fact that the workman is ministering to his personal comforts or necessities, as by warming himself, or seeking shelter, or by leaving his work to relieve nature, or to procure a drink, refreshments, food, or fresh air, or to rest in the shade.' (Citing numerous sustaining cases.)"

Here, then, is the reason for the compensation award: His injury was suffered during his working day while he was doing a natural thing, a thing which an employee, while working, might reasonably do. The fundamental inquiry is whether or not the act in question, either because of its nature, or local custom, or contractual provision, is reasonably to be regarded as part of the on-the-job activities of the human being involved, a part of his normal and reasonable sphere of activities. If so, it takes place "in the course of his employment."

In view of the authority vouchsafed an early Massachusetts case, *McNicol's Case* (1913), 215 Mass 497 (102 NE 697, LRA1916A, 306) by our Court in a recent decision, *Daniel* v. *Murray Corporation of America*, 326 Mich 1, we deem it pertinent to cite a more recent Massachusetts decision, *Kubera's Case*

(1946), 320 Mass 419 (69 NE2d 673). Here the claimant, as in the case at bar, was a laundry employee. She was injured, as here, in her 10-minute rest period. As in the case before us, she was injured on the steps of the laundry. Unlike our case, however, she did not receive pay during this period, nor was its grant a matter of contractual agreement. The insurer contended (p 420) "that the employee at the time of her injury was not under the control or supervision of the employer, that she was not paid for the time spent in the recess period, and that she was not engaged in the performance of anything connected with her work and therefore was not entitled to compensation."

The holding of the court is short and enlightened. It follows:

"These rest periods could be found to be one of the implied terms of the contract of employment or at least to constitute one of the working conditions at the plant of the employer. They are not uncommon in factories where women are employed. It is not unreasonable to assume that their existence is justified by the mutual benefit received by the employer and the employee. The use of the steps by the employees during these brief respites from labor must have been contemplated by both the employer and the employees during the continuance of employment. It could be found that the presence of the claimant on the steps was a natural and probable consequence of her employment, even though she had the right to decide whether she would spend her recess period there or remain within the factory. There was a causal connection between the employment and the injury if the employment exposed the employee to the risk which caused the injury. 'An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects.'

Caswell's Case, 305 Mass 500, 502 (26 NE 328). Watkins v. New York, New Haven & Hartford Railroad, 290 Mass 448 (195 NE 888); Sylvia's Case, 298 Mass 27 (9 NE2d 412); Souza's Case, 316 Mass 332, 334 (55 NE2d 611).

"An employee is not necessarily barred from compensation because his injury occurred during a rest period for which he was not paid. The fact that an employee was injured while on his employer's premises before or after his regular hours of labor had begun or ended or during a regular intermission in the day's work, and while he was not actually engaged in the performance of the duties for which he was hired, does not preclude him from an award of compensation if at the moment of his injury he was occupying himself in some manner incidental to his employment. Rest and relaxation of an employee during a brief designated period, at a place upon the employer's premises commonly so used with the knowledge and assent of the latter, may be found to be incidental to employment. Many decisions covering this particular point and somewhat similar points have been recently collected in Souza's Case, supra, 335; Murphy v. Miettinen, 317 Mass 633, 635, 636 (59 NE2d 252); Rogers's Case, 318 Mass 308, 309 (61 NE2d 341, 159 ALR 1394); and Bradford's Case, 319 Mass 621–623 (67 NE2d 149)."

This decision, it will be noted, did not rest on specific statutory coverage. The question, as in the case at bar, was simply whether or not her injury arose out of and was received in the course of her employment. It was, indisputably so in my opinion, and here also.

The award should be affirmed. Costs to appellee.

Butzel, J., concurred in affirmance.