PARK *v.* EMPLOYMENT SECURITY COMMISSION.

DORSEY *v.* SAME.

1. Unemployment Compensation—Employing Unit—Establishment—Disqualification for Benefits.

The term "employing unit," as defined in the employment security act, and the term "establishment," not therein defined although used therein, are not synonymous, where the terms

---

References for Points in Headnotes

[1] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds §§ 24–27.
[2–4, 6, 7] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 36.
[5] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 49.
[8] 5 Am Jur, Attorneys at Law § 67 *et seq.*; 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 46.
[9, 11] 2 Am Jur, Agency § 26 *et seq.*; 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 43 *et seq.*
[10] 2 Am Jur, Agency § 31.
[12, 13] 5 Am Jur, Attorneys at Law §§ 80, 81.
[14] 50 Am Jur, Statutes §§ 321, 322.
[15] 14 Am Jur, Costs § 21 *et seq.*

are so used as to indicate the legislature, in disqualifying an employee from unemployment compensation benefits, regarded the former term as the broader and more inclusive term and the latter as not including out-of-State plants of an employer even when plants are functionally integrated (CLS 1952, § 421.29[1]).

2. SAME—DISQUALIFICATION FOR BENEFITS—STRIKE AT FUNCTIONALLY INTEGRATED OUT-OF-STATE PLANT.

Employees at plant in this State who were out of work because of lack of parts produced at struck plant, owned by the same employer but located in another State, in which latter plant there was a strike in progress that was called by the same international union as represented claimant employees, were not disqualified from benefits by reason of such labor dispute in the out-of-State plant, the term "establishment" not embracing an out-of-State plant of the employer even though functionally integrated (CLS 1952, § 421.29 [1]).

3. SAME—DISQUALIFICATION FOR BENEFITS—ESTABLISHMENT.

The term "establishment," as used in provision of employment security act relative to disqualification for unemployment benefits "because of a labor dispute in establishment in which he is or was last employed" has reference to a distinct physical place of business, a single unit of employment (CLS 1952, § 421.29[1]).

4. SAME—DISQUALIFICATION FOR BENEFITS—ESTABLISHMENT.

Neither the test of functional integrality, general unity nor physical proximity should be the sole test applied in interpreting the term "establishment," in employment security act providing that a claimant for unemployment compensation would be disqualified if lack of work were due to labor dispute in which he is or was last employed, overruling *Chrysler Corp.* v. *Smith,* 297 Mich 438, in part (CLS 1952, § 421.29[1]).

5. SAME—FINDINGS OF APPEAL BOARD—GREAT WEIGHT OF EVIDENCE.

The Supreme Court is bound by the findings of fact of the appeal board of the employment security commission, if the findings are supported by the great weight of the evidence (CLS 1956, § 421.38).

6. SAME—DISQUALIFICATION FOR BENEFITS—STRIKE AT EMPLOYER'S OUT-OF-STATE PLANT.

A claimant for unemployment compensation benefits arising from work stoppage at plant in this State was not disqualified from receiving benefits, where there was no labor dispute at such

place of employment and claimants were not directly involved in labor dispute in employer's out-of-State struck plant functionally integrated with plant in which claimants were employed and parts necessary for claimant's operations were not forthcoming from other plant (CLS 1952, § 421.29[1]).

7. SAME—DISQUALIFICATION FOR BENEFITS—DIRECT INTEREST IN STRIKE AT OUT-OF-STATE PLANT OF SAME EMPLOYER.

A finding of direct interest of claimants in Michigan plant in labor dispute in an out-of-State plant of the same employer, even if supported by the great weight of evidence, does not, standing alone, disqualify claimants from unemployment benefits, since claimants were not directly involved, being employed in a different establishment than where labor dispute was in progress (CLS 1952, § 421.29[1]).

8. SAME—APPEARANCE OF ATTORNEY FOR CLAIMANTS—APPEALS.

Appeals presented by attorney for claimants for unemployment compensation *held*, valid, where claims were initiated by the attorney, it being unnecessary that there be written authorization of counsel (CL 1948, § 421.31; 1954 AC, § R 421.412).

9. SAME—UNION—POWER OF ATTORNEY.

Union member's irrevocable designation of union as member's exclusive agent for purposes of representing member in the presentation, prosecution, adjustment and settlement of all grievances, complaints or disputes of any kind arising out of the employer-employee relationship *held*, not a general power of attorney authorizing union to represent employee in proceeding to recover unemployment compensation (CL 1948 and CLS 1952, § 421.1 *et seq.*).

10. PRINCIPAL AND AGENT—CONSTRUCTION OF POWER OF ATTORNEY.

Powers of attorney, even when specifically so designated, are strictly construed and cannot be enlarged by construction.

11. UNEMPLOYMENT COMPENSATION—ATTORNEY AND CLIENT.

Claimants for unemployment compensation can be represented by an attorney (CL 1948, § 421.31; 1954 AC, § R 421.412).

12. ATTORNEY AND CLIENT—APPEARANCE—PRESUMPTIONS.

A presumption arises that an attorney was properly authorized when he enters an appearance in behalf of a party.

13. SAME—ETHICS—UNION ATTORNEY—CLAIMANTS FOR UNEMPLOYMENT COMPENSATION.

Whether or not it was ethical for a union attorney to file appearances on behalf of some 11,000 claimants for unemploy-

ment compensation benefits ranging from $27 to $105, is not resolved, where it appears that the employment security commission indulged a presumption of authorization on the attorney's appearance for a claimant because of the practical problem.

14. Courts—Construction of Statutes—Legislative Silence—Overruling Cases.

A court may properly correct a previous error it has made as to the interpretation of a statute by overruling the earlier case, notwithstanding the legislature has remained silent during the interim.

15. Costs—Public Question—Unemployment Compensation.

No costs are allowed in proceedings by some 11,000 claimants for unemployment compensation benefits, where public question was involved in determination of case (CLS 1952, § 421.29[1]).

Dethmers, C. J., and Carr, J., dissenting.

Appeal from Wayne; Brennan (John V.), J. Submitted April 18, 1958. (Docket Nos. 43, 44, Calendar Nos. 47,065, 47,124.) Decided January 12, 1959. Rehearing denied February 19, 1959. Appeal dismissed by Supreme Court of the United States June 8, 1959.

Alexander Park and other employees of Ford Motor Company filed claims for unemployment compensation benefits because of layoff necessitated by labor dispute and work stoppage in company's out-of-state plant. Similar claims for John L. Dorsey and another group of employees filed in their behalf by labor union attorney. Cases consolidated. Attorney General intervened on behalf of the people of the State for reasons of public policy.

Recognizing Dorsey's right to representation over objections of procedural nature, Appeal Board of the Employment Security Commission denied compensation in both cases.

On certiorari, circuit court upheld order denying compensation, and held procedural question in Dorsey case moot. Intervenor Attorney General appeals in Park case. Plaintiff Dorsey appeals.

Reversed to grant unemployment compensation benefits in both cases.

*Zwerdling & Zwerdling (A. L. Zwerdling,* of counsel), for plaintiffs.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Stanton S. Faville,* Chief Assistant Attorney General, and *Florence N. Clement,* Assistant Attorney General, for intervenor Attorney General.

*George M. Bourgon,* Assistant Attorney General, for defendant Employment Security Commission.

*William T. Gossett (Richard B. Darragh, Joseph A. O'Reilly* and *Richard A. Fellrath,* of counsel), for defendant Ford Motor Company.

*Amici Curiae:*

*Frank E. Cooper* and *Beaumont, Smith & Harris,* for Michigan Employers' Unemployment Compensation Bureau and Michigan Manufacturers' Association.

*Edward P. Wright, Daniel J. Tindall, Jr.,* and *Wellington M. Watters (Dickinson, Wright, Davis, McKean & Cudlip* and *Kelley, Drye, Newhall & Maginnes,* of counsel), for Chrysler Corporation.

EDWARDS, J.  These cases are of great financial importance to the litigants.  Yet, after a careful review of over 1,600 printed pages of records and briefs, we conclude that they turn upon the answer to a relatively simple legal question—Does the term "the establishment," as used in the Michigan employment security act, encompass both Ford plants in the vicinity of Detroit, Michigan, and the Ford forge plant at Canton, Ohio, for the reason that the former cannot operate long without the latter?

The question is by no means new.  In very similar form, it has previously been submitted to the judicial systems of 9 States, each of which had at the time

statutory language of like import to that of our State to construe.

The appellate courts in Massachusetts, New Jersey, Minnesota, Kentucky, New York, Virginia, and Pennsylvania answered the question in the negative. Georgia's supreme court alone answered affirmatively. In the ninth State, Texas, where compensation claims were allowed under a similar situation and somewhat similar statutory language, the present defendant stipulated to dismissal of its appeal—perhaps in anticipation of a legislative amendment favorable to its position, which did indeed follow.

For reasons which we detail hereafter, we arrive at the same conclusion reached by the great majority of the courts which have considered the problem. Although, as we will note, much more is in dispute between these parties, in the end this decides the principal question in these cases.

We have before us 2 cases involving separate groups of claimants of unemployment compensation, totaling approximately 11,000 such claims in all. The claimants in these cases,* in May of 1953, were employed at 3 plants of the Ford Motor Company in the vicinity of Detroit, Michigan. The 3 plants involved were the Mound Road plant, the Highland Park plant, and the Ford Rouge plant at Dearborn. The employees who are claimants in these appeals were laid off from the 3 plants just referred to as a result of failure of forgings, essential to the operation of their particular departments, to arrive at the plant concerned as a result of the stoppage of manufacture of such forgings at the Canton forge plant due to a strike called by the UAW-CIO on April 20, 1953, at the Canton plant.

---

* All claims were consolidated for hearing and appeal in these cases under terms of the statute, CL 1948, § 608.1 (Stat Ann § 27.-591).

In the lengthy record which contains much hotly-disputed testimony, 2 facts appear to be clear and beyond dispute: (1) that the employees concerned were laid off either as a direct or indirect result of the failure of forgings previously manufactured at the Canton forge plant to arrive at departments or plants where they would customarily be incorporated into subassemblies and assemblies of Ford products; (2) that no strike vote, call, walkout, or picketing occurred in any of the 3 plants under consideration, and that all employees concerned continued work until laid off by the company (indeed some of them returned to work on call during the period of the Canton forge plant strike), and that other union employees, whose operations were not affected by the lack of forgings, continued work in each of the 3 plants through most or all of the entire Canton strike period.

The Ford Motor Company is a Delaware corporation, with its principal office and principal manufacturing plants located in Michigan. It has extensive manufacturing assembly plants in many other States, and this record indicates that all of the plants are integrated in operation with its Michigan plants.

The union with which we are concerned in these cases is the International Union, UAW-CIO which, during the period in question, was the exclusive collective bargaining agent of all of the hourly-production and maintenance employees of the Ford Motor Company in all of its plants throughout the United States. The contract between the UAW workers and the Ford Motor Company was for a 5-year period expiring June 1, 1955.

It appears that during the spring of 1953 the local disputes which resulted in the Canton forge plant strike occurred, and ultimately were resolved, at the same time as a union-company dispute over modification of the so-called master agreement. The briefs

of claimants in these cases argue that the Canton forge plant strike was over purely local issues, and was unrelated to the negotiations for reopening and modification of the master agreement. It is the company's position that the Canton forge plant strike was a device employed by the union for the purpose of forcing modification of the master agreement. In either event, it appears that the settlement of the Canton forge plant strike, and the modification of the master agreement, both occurred on May 25, 1953, following by 3 days a similar modification of a national agreement between the UAW and the General Motors Corporation signed on May 22, 1953.

The claims of the respective parties were thus phrased by agreement of respective counsel, and by certification of the circuit court judge who heard this matter, in the statement of proceedings and facts accompanying application for leave to appeal addressed to this Court:

"The claimants contend that they were laid off due to a lack of work, being involuntarily unemployed and in no way involved in a labor dispute; that a labor dispute did not occur in the establishment in which they were employed; that the Michigan act does not include within either the definition of establishment or employing unit the Ohio plant of Ford Motor Company, whether for purposes of taxation or of disqualification; that, regardless of any other factor, there can be no disqualification of claimants in this case because the fundamental prerequisite for disqualification under section 29(1) (b) is the existence of a labor dispute in the establishment in which he is or was last employed, and that the establishment here does not include within its scope the plant in another State in which the labor dispute occurred; that the modification of the national agreement between the Ford Motor Company and UAW, May 25, 1953, was occasioned by the similar modification of the national agreement be-

tween UAW and General Motors Corporation 3 days earlier (May 22, 1953), and that the unemployment of claimants was in no way occasioned by this reopening of the Ford contract to conform with the action taken by General Motors; and that the labor dispute in the Canton, Ohio, plant was over issues involving that plant only, and did not in any way involve a dispute in which these Michigan claimants were directly involved in any event.

"The employer, on the other hand, contends that a disqualification of the claimants does not involve an extraterritorial application of the Michigan employment security act; that the Canton plant was and is a part of the Ford establishment within the meaning of section 29(1)(b) of the act; that there was close functional integration and synchronization between the Canton plant and its other automotive manufacturing and assembly units, departments and plants in the Detroit area and elsewhere; that its plants in the Detroit area depended upon a continuous flow of parts and material produced at the Canton plant in the manufacture of its product, namely, cars, trucks, and tractors; that in September, 1952, just 2 years after signing a 5-year collective bargaining agreement which by its terms was not openable until 1955, the International Union, UAW, enunciated its so-called 'Living Document' theory and as the exclusive collective bargaining agent of all employees covered by such master or national agreement including these claimants, demanded substantial changes in such master agreement; that in support of these demands the union embarked upon a course of conduct, from the early fall of 1952 to the time of the settlement of the Canton strike, directed toward bringing about more liberal pensions, adjustments in the cost of living allowances, vacations for retiring employees, increased wages and other matters applicable under the master agreement to all Ford UAW members including these claimants; that the Canton strike was a part of a broad program of harassment of the company on the part of the union and was used

as a lever to pry concessions from the company with respect to the master agreement; that the issues in the Canton dispute became inseparably intertwined with the controversy over master contract changes; that the dispute over the master agreement changes brought about the Canton strike, or at the very least prolonged it to the point where the employer's plants in the Detroit area and elsewhere were shut down with the resultant unemployment of the claimants; that the claimants were directly involved in the dispute and shared in the substantial benefits gained for them in the dispute settlement; that owing to the functional integration between the plants and the strike which occurred in the Canton plant, it became necessary to close the Detroit area plants, causing the unemployment of the claimants, and that Ford, being 1 establishment, and the claimants being directly involved in the labor dispute, they were properly disqualified from receiving benefits under pertinent provisions of the labor dispute provision of the act (section 29 [1][b], subsections [2] and [4])."

Two cases are the subject of appeal by the claimants to this Court. In Park v. Employment Security Commission, Case No. 280,754, approximately 5,500* claimants were denied unemployment compensation by the Michigan employment security commission and, on appeal to the referee, found their claims denied there likewise. On subsequent appeal to the appeal board, the referee's decision was affirmed by a divided board, with the majority resting its opinion upon the holding "that all of the units of the Ford Motor Company, both in Michigan and Ohio, constituted 1 establishment within the meaning of that word as contained in the Michigan act." On appeal to the Wayne county circuit court, the circuit judge who heard the case found this issue to be the "piv-

---

* A certain number of the claims filed in both cases were otherwise disposed of.

otal" one, and entered this finding in affirming the decision of the majority of the appeal board:

"That this issue may be determined at this level with finality, the court is of opinion and so finds, that the term 'establishment' as used in the Michigan employment security act is not confined to the State lines of Michigan; that, more specifically, in the cases at bar, the term 'establishment' comprehends the Michigan plants, *supra,* where the claimants were employed and the Canton, Ohio, forge plant where the strike compelling the stoppage of work at the Michigan plants, occurred."

In the Park case, there is no issue pertaining to validity of the appeals.

The second case is entitled Dorsey v. Employment Security Commission, Case No. 280,866. This case consists of approximately 5,500 claims wherein the claimants did not take appeals themselves, except as will be noted later through representation by counsel and/or the union, and where no written authorizations for either representation or appeal appear in the record. All of the same issues (similarly decided below) as have just been recited in relation to the Park case exist in the Dorsey case. In addition, however, at the hearing before the referee, the defendant and appellee Ford Motor Company objected to this group of claims on the ground that no valid appeal had been taken. In his decision, the referee upheld this objection. On appeal to the appeal board of the Michigan employment security commission, the appeal board unanimously held that the appeals involved in the Dorsey case were valid on the ground that the union was designated as agent of these employees in the union constitution and, hence, had the right to employ counsel on their behalf in prosecuting the appeals, and on the further ground that the commission recognized an appearance by counsel where, as a member of the bar, he entered appear-

ances for the individuals concerned, and their actions ratified that appearance.

In the appeal of the Dorsey case to the circuit court, the circuit judge, having previously entered a ruling on the "establishment" question which invalidated all claims in both cases, held that the validity-of-appeals issue was moot. The issue is preserved for review in this Court by a cross appeal upon this issue alone, taken by the Ford Motor Company.

The issues in this case, as we see them and shall decide them, are as follows:

1. As a matter of law, does the functional integration of a company's manufacturing plants located in Michigan and several other States make them a single "establishment" within the meaning of the Michigan employment security act?

2. What effect, if any, do subsections 1, 2, 3 and 4 of section 29(1)(b) of the Michigan employment security act have upon disqualification of a claimant for unemployment compensation in the event it is found that his unemployment is not due "to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed"?

3. Under the facts revealed by this record, are the appeals advanced in the case entitled Dorsey v. Employment Security Commission valid appeals?

The basic section to which we must turn for answers to the first 2 of these questions is section 29(1) of the Michigan employment security act (CLS 1952, § 421.29, subd [1] [Stat Ann 1953 Cum Supp § 17.531, subd (1)]):

"An individual shall be disqualified for benefits:
* * *

"(b) For any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the estab-

lishment in which he is or was last employed: Provided, however, That no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute. For the purpose of this section, no individuals shall be deemed to be directly involved in a labor dispute unless it is established:

"(1) That, at the time or in the course of a labor dispute in the establishment in which he was then employed, he shall in concert with 1 or more other employees have voluntarily stopped working other than at the direction of his employing unit, or

"(2) That he is participating in or financing or directly interested in the labor dispute which caused the stoppage of work: Provided, however, That the payment of regular union dues shall not be construed as financing a labor dispute within the meaning of this subsection, or

"(3) That at any time, there being no labor dispute in the establishment or department in which he was employed he shall have voluntarily stopped working, other than at the direction of his employing unit, in sympathy with employees in some other establishment or department in which labor dispute was then in progress, or

"(4) That at any time, there being no labor dispute in the particular department or unit in which he was then employed, or there being no labor dispute among the grade or class of workers within the employing unit to which he belongs, he shall have become unemployed because of a stoppage of work in his particular department or unit, or among the grade or class of workers to which he belongs, which stoppage of work is due to a labor dispute which was or is in progress in some other department or unit or among a different grade or class of workers of the same employing unit by whom he was then employed."

Webster defines "establishment" as follows:

"*d.* The place where one is permanently fixed for residence or business; residence, including grounds, furniture, equipage, retinue, et cetera, with which one is fitted out; also, an institution or place of business, with its fixtures and organized staff; as, large *establishment;* a manufacturing *establishment.*" Webster's New International Dictionary (2d ed), p 874.

Judges and lawyers can frequently do astonishing things with words. No layman would venture to suggest that the single word "establishment," used in the paragraph above, could in normal usage be applied to both the Ford Rouge plant in Dearborn, Michigan, and the Ford forge plant in Canton, Ohio.

The writer believes also that no layman, without a specific motive in mind, would read the statutory provisions quoted above and come to the conclusion that the legislature had any such inclusiveness in its intended use of the word. Although the statute carries within it no definition of "establishment," its use of the term is, in our opinion, such as clearly to rule out the broad interpretaton sought by appellees. Thus, the statute defines the term "employing unit" in the same broad sense which appellees seek to apply to "establishment":

" 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation, whether domestic or foreign." CL 1948, § 421.40 (Stat Ann 1950 Rev § 17.542).

And, in the second sentence of the same definition paragraph, it makes such use of the word "establishment" as, in our view, to preclude any attempt at definition in terms of all integrated plants of a company, wherever located:

"All individuals performing services within this State for any employing unit which maintains 2 or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this act."

Indeed, since appellee Ford Motor Company's basic premise is that all of its plants are integrated with its Michigan plants, it appears that appellee seeks an interpretation of the word "establishment" synonymous with the term "employing unit" as defined in the statute.

Yet, in the very disqualification section itself which we have quoted, in the prefatory sentence and in subsections 1, 2 and 4, we find uses of the 2 terms "employing unit" and "establishment" which clearly indicate that the legislature did not regard them as synonymous, and did regard the former as the broader and more inclusive term.

While the dictionary, the statute, and common sense all argue otherwise, we are urged that this Court, in *Chrysler Corp.* v. *Smith,* 297 Mich 438 (135 ALR 900), so defined "establishment" as to require our holding, as did the circuit judge and the appeal board, that the Ford Detroit area plants in Michigan and the Ford Canton forge plant in Ohio were all 1 "establishment."

It might be noted at the outset that no such factual situation was involved in *Chrysler Corp.* v. *Smith* as confronts us here.  The plants there involved were all in 1 industrial community—the Detroit area; they were all located within 11 miles of one another; and they were all located in the State of Michigan.  We deal here with a disqualification argument applicable to nonstriking employees in 3 Detroit area plants, all in Michigan, where the strike inducing the unemployment occurred in another community 150 miles away, and in another State.

The difficulty to be faced in tying the definition of "establishment," as used in the act, to the primary test of integrated functioning, was foreseen by the circuit judge (now Mr. Justice CARR) who heard the *Chrysler Corp.* v. *Smith Case* at the trial court level:

"Undoubtedly the legislature in the enactment of this law had in mind that there are numerous enterprises in Michigan that, like the plaintiff, maintain different plants in which operations are conducted. If, as contended by counsel for the plaintiff, it was intended to embrace within the term all of the manufacturing properties of an employer I think we must assume that appropriate language indicating such intention would have been used. It is a matter of common knowledge, also, that many large business enterprises maintain plants in other States as well as in Michigan and the operations of such plants are more or less correlated. If the term 'establishment' is given the broad interpretation contended for, if it means all of the manufacturing properties of an employer, at least those that to some extent are functionally integrated, it is quite conceivable that we might have an establishment partly within and partly without the State of Michigan. However, there is nothing in the statute to suggest that the legislature had any such situation in mind and counsel have not discussed its possibilities." 59 (pt 2) Oct Term, 1940, Michigan Supreme Court Records and Briefs, pp 2399, 2400 (*Chrysler Corp.* v. *Smith,* 297 Mich 438).

The vigorous dissent recorded by Justices Mc-Allister and Bushnell did likewise:

"No contention is made that integrated plants of different owners in the same State, or integrated plants owned by the same corporation operating under the laws of different States, or integrated plants in the same State or different States in which employees are represented by different bargaining agents, should be considered 1 establishment within

the meaning of the act.   The conclusion, therefore, would seem inevitable that the provisions of the act in no way contemplate that integration of plants is the sole criterion for the statutory interpretation of the word 'establishment'—and that several integrated plants are 1 establishment while several unintegrated plants are several establishments." *Chrysler Corp.* v. *Smith, supra,* pp 468, 469.

This same opinion authored by Justice McALLISTER likewise provided a definitive analysis of the distinctions between the Michigan statute and that of Wisconsin which was construed by the Wisconsin supreme court in another case emphasized by appellee Ford Motor's brief, *Spielmann* v. *Industrial Commission,* 236 Wis 240 (295 NW 1).*

---

* "Since the argument of this case, the supreme court of Wisconsin has had occasion to pass upon the meaning of the term 'establishment' as used in the unemployment compensation act of that State, and appellant Chrysler Corporation cites the decision thereupon as authority for its contention before us.   *Spielmann* v. *Industrial Commission,* 236 Wis 240 (295 NW 1).   The cited case involved claims for unemployment compensation arising out of a stoppage of work in the plants of the Nash-Kelvinator Corporation.   A strike caused the closing of 1 plant which resulted in stoppage of work and plaintiff's unemployment in another plant 40 miles away.   The question to be decided was whether the labor dispute in the first plant was a labor dispute in active progress in the establishment in which plaintiff was employed.   The court concluded that the 2 plants constituted a single establishment within the meaning of the Wisconsin statute.

"In considering the Wisconsin case, we deem it significant that the court, in construing the term 'establishment,' particularly emphasized that, in arriving at its determination of the meaning of that word, the purpose of the statute must be considered, and that the statute must be construed to effect that purpose, if discoverable, and if such a construction were possible.   The court then pointed out that it was the employer upon whom the burden was placed to accumulate the fund out of which benefits were to be paid, and that it was the company who was required to accumulate the fund; that the employer was encouraged by the act to furnish steady employment. It was further emphasized that these declarations of purpose pointed to the construction reached by the court that the 2 plants constituted a single establishment.   Moreover, the court observed that the fact that the employee was not himself at fault for his loss of employment, was not the sole cause, under the statute, for suspension of benefits; that the law provided that such an employee was not eligible in case the loss of employment was caused by act of God, fire, or other catastrophe, or act of civil or military authority affecting the place of employment.   The court concluded its discussion

Factually, the Wisconsin case was even more remote from our present facts since the 2 plants there held to be 1 "establishment" within the meaning of the Wisconsin statute were both in the same State though 40 miles apart, were both under 1 general works manager, and were operated on 1 production schedule maintained by trucks scheduled between the 2 plants with deliveries so synchronized that a body built for 1 order at Milwaukee would meet the chassis for the same order built at Kenosha on the assembly line, without intermediate storage.

On the other hand, the record in the cases considered herewith indicates for all plants concerned entirely separate and distinct plant managements and plant production schedules, as well as separate

---

of this question by stating that the meaning of the word 'establishment' was to be drawn from the whole act, 'rather than from so insignificant a thing as a single proposition.'

"The differences between the Wisconsin and Michigan statutes are obvious. In the Wisconsin statute there is no declaration of policy, as in our law, that the accumulation of funds for unemployment reserves should be used for the benefit of persons unemployed through no fault of their own, in order to limit the consequences of relief assistance. In this connection, the court, in the cited case, observed that in many instances compensation for loss of employment was denied under the Wisconsin law, although the unemployment resulted 'from no fault of the employee and the loss is beyond his power to prevent.' Furthermore, the Wisconsin law sets forth in its declaration of policy that each employer should finance compensation for his own unemployed workers and that each employer's contribution should vary with his own unemployment costs. The reserves, under the Wisconsin law, are in the nature of private funds of each employer to be used for his unemployed workers. The State acts as a trustee. The Michigan fund is a general pooling, made up of various contributions, for the benefit of all unemployed workers, whether in the plant of the employer making the contribution or in another plant. Our State declares its public policy is to provide against *involuntary unemployment*. There is no similar provision in the Wisconsin law; and that is not the criterion for the payment of benefits under the statute of that State. With regard to declarations of policy, the Wisconsin decision does not militate against the expressed policy of the law of that jurisdiction. To give the construction to the Michigan statute which is contended for by appellant is a negation of the declared policy of our legislature. Under these circumstances, and because of the differences in the objects and declarations of policy in the 2 statutes, we do not consider the Wisconsin case as authority to be followed in the instant controversy." McALLISTER dissent, *Chrysler Corp.* v. *Smith, supra*, 464–466.

and distinct industrial relations and employment offices, employee seniority lists, local unions, and local labor-management agreements.

We now turn our attention to precedents which deal directly with unemployment compensation cases where it has been argued that a strike in a plant in one State disqualifies those laid off as a result in an integrated plant of the same company in another State.

In 1949, a strike occurred in the Ford Rouge plant in Michigan. The effect of that strike was eventually to paralyze production in a considerable number of Ford assembly plants located in various States. The workers thus laid off sought unemployment compensation benefits under statutes quite similar (though in no case identical) to our own. In these cases, too, there were national issues pending on the bargaining table between the same union and the same company as are here involved, and the company arguments for disqualification of the employees-claimants were based on the contention that the Rouge plant strike in Michigan was really carrying forward the industrial argument for the benefit of Ford union members in New York, Georgia and California, to mention only the most widely scattered of the plants.

The cases referred to arose from unemployment claims filed by workers at Ford plants (most of them assembly plants) at Hapeville, Georgia (see *Ford Motor Co.* v. *Abercrombie,* 207 Ga 464 [62 SE2d 209]); Louisville, Kentucky (see *Ford Motor Co.* v. *Kentucky Unemployment Compensation Commission* [Ky], 243 SW2d 657); Somerville, Massachusetts (see *Ford Motor Co.* v. *Director of the Division of Employment Security,* 326 Mass 757 [96 NE2d 859]); St. Paul, Minnesota (see *Nordling* v. *Ford Motor Co.,* 231 Minn 68 [42 NW2d 576, 28 ALR2d 272]); Metuchen and Edgewater, New Jersey (see *Ford*

*Motor Co.* v. *New Jersey Department of Labor &
Industry,* 5 NJ 494 [76 A2d 256]) ; Buffalo and Green
Island, New York (see *Machcinski* v. *Ford Motor Co.,*
277 App Div 634 [102 NYS2d 208]; Chester,
Pennsylvania (see *Ford Motor Co.* v. *Unemployment
Compensation Board,* 168 Pa Super 446 [79 A2d
121]) ; Dallas, Texas (see *Ford Motor Co.* v. *Texas
Employment Commission,* 7 CCH Unemployment
Insurance Rep, par 8148, p 46,744) ; and Norfolk, Virginia (see *Ford Motor Co.* v. *Unemployment Compensation Commission,* 191 Va 812 [63 SE2d 28]).

As we have previously noted, compensation was
allowed in 8 of these 9 cases after rejection of the
argument that Ford Motor Company integration
rendered the individual far-flung plants 1 establishment with the Ford Rouge plant in Dearborn, Michigan.   The exception was the Georgia case, where
the Georgia supreme court rejected liberal construction of the unemployment compensation act and flatly stated with a finality unhampered by excess concern for fine definition or logic:

"We therefore hold that the Hapeville plant, at
which the claimants were employed, and the Dearborn parts-producing plant, where the strike occurred and which compelled cessation of work at the
Hapeville plant, were inseparable and indispensable
parts of 1 and the same 'factory, establishment, or
other premises' as contemplated by those terms as
employed in the act now being construed." *Ford
Motor Co.* v. *Abercrombie,* 207 Ga 464, 470.

That court also found as a fact that there was no
participation in, nor causing of, the strike by any of
the claimants, but that they were bound by the actions of their international union officers in authorizing the Rouge plant strike on the theory of principal and agent.   This holding would, of course, suggest that any strike in any plant of any employer in

any State would disqualify for unemployment compensation benefits any employee of any other plant, whether in the same State or not, and whether owned by the same employer or not, provided he was unemployed as a result of that strike and the strike was called by the same union.

We find no warrant for such conclusions in the Michigan statute.

The balance of the courts followed definition of the word "establishment" very similar to that which we have referred to. The New Jersey supreme court held:

"The standard of 'functional integration' is not to be found in the legislative expression. The statutory sense of the term 'establishment' is not embracive of the whole of Ford's far-flung enterprise as a single industrial unit. It has reference to a distinct physical place of business. Such is its normal usage in business and in government. *A. H. Phillips, Inc.,* v. *Walling* (1945), 324 US 490 (65 S Ct 807, 89 L ed 1095, 157 ALR 876). 'Establishment' is defined as the 'place where one is permanently fixed for residence or business'; also, 'an institution or place of business.' Webster's New International Dictionary (2d ed), p 874." *Ford Motor Co.* v. *New Jersey Department of Labor & Industry,* 5 NJ 494, 502.

The Virginia supreme court, with reasoning we consider sound, held:

"The unemployment compensation act was intended to provide temporary financial assistance to workmen who became unemployed without fault on their part. The statute as a whole, as well as the particular sections here involved, should be so interpreted as to effectuate that remedial purpose implicit in its enactment. When its purpose is kept in view, we cannot agree that managerial and operational integration and functional cooperation upon the official level are to be the chief factors upon which employ-

ment status and employees' rights are to be determined. Our problem is, in the final analysis, to recognize the remedial aim and purpose of the act and then interpret and construe the language and apply it to the facts proved. In doing this, we do not think that the contractual obligations and relations brought about through execution of the master labor contract by Ford Motor Co. and UAW-CIO may be considered as determining whether or not the Norfolk plant and the Rouge plant constitute and are 1 establishment within the meaning of the statute. Those plants either constitute 1 establishment or separate establishments regardless of whether the master labor contract is or is not in force. The circumstances of employment, rather than those of management and operation, are of primary importance in determining the unity and integration, or the lack of unity and integration, of the plants. The accumulative weight and effect of these circumstances, we think, are sufficient to show that the Norfolk assembly plant is separate from the Rouge plant. No labor dispute or strike was fomented or participated in by the local union to which the claimant employees belong, nor was there any labor dispute on the premises, at the plant, or in the establishment where they were actually employed. The labor dispute and resultant strike were in fact and in reality at and in Dearborn. The most that can be said is that the management and operation of the vast and far-flung Ford Motor industry is so integrated and synchronized that a serious strike at its headquarters and in its principal plants at Dearborn must in time affect the entire industry and cause the shut down of plants and other establishments wherever situated. The dependence of 1 or more plants in this great industry upon the home office and principal manufacturing establishment does not, however, necessarily make of the entire industry 1 plant or 1 establishment." *Ford Motor Co.* v. *Unemployment Compensation Commission,* 191 Va 812, 824, 825.

In a number of the cases we have referred to, the act construed referred to "factory, establishment or other premises," as was true in the draft version of the model statute.* In the case arising from the shutdown of the St. Paul, Minnesota, assembly plant, the word "establishment" was employed alone after amendment had deleted the accompanying words "factory" and "other premises"—in short, the same situation as prevails at present in relation to our Michigan statute.

In a very similar fact situation with a very similar statutory provision to construe, the Minnesota court set forth the following analysis of the "establishment" problem on which we do not think we can improve:

"Rather than distinguish the cases on differing facts, we prefer to place decision on the broader ground that we believe that the test of functional integrality, general unity, and physical proximity should not be adopted as an absolute test in all cases of this type. No doubt, these factors are elements that should be taken into consideration in determining the ultimate question of whether a factory, plant, or unit of a larger industry is a separate establishment within the meaning of our employment and security law. However, there are other factors which must also be taken into consideration. The difficulty with attempting to use, as an absolute test, the factors laid down in the *Spielmann Case* comes in its application to the facts of a particular case. Many enterprises have functional integrality between factories which are separately owned. Some are so integrated in part with units or factories having the same ownership and in part with factories or plants which are independently owned. That is the situation which we have in the instant case. Out of some

* Draft Bills for State Unemployment (1936), § 5, pp 9, 10 (Rev ed 1937), pp 20, 22, published in Washington, D. C., by United States Social Security Board.

3,800 or 4,000 parts, about 900 come from the Rouge plant. Some come from other plants owned by the Ford Motor Company, and still others come from plants independently owned. A shutdown caused by a strike or other labor dispute at 1 of such independent vendors might conceivably cause a shutdown at the St. Paul Ford plant. This did actually happen in 1945, when a strike occurred at the Kelsey Hayes plant. We assume that it is not uncommon that the same international union would represent the employees of several independent plants or factories operating as the Ford plant does with its independent vendors, but we do not believe that anyone would contend that a strike at the plant of such independent vendor would disqualify employees of the Ford plant if it was forced to shut down on account of the lack of parts furnished by such independent vendor.

"Proximity is equally unsatisfactory. In order to apply this factor, what distance shall be considered short enough to constitute proximity? Shall the St. Paul branch of the Ford plant be close enough to the Rouge plant and the Georgia or Los Angeles plants, operating in a similar manner, be too far away, or shall any 2 plants anywhere in the United States be near enough?

"Nor is general unity of itself a test. Our statutes recognize that the same employing unit may maintain 2 or more separate establishments within the State. Section 268.04 subd 9.* It might be argued that the legislature had in mind separate establishments which are not related in any way, but the legislature did not so state, and we do not believe it can be read into the statute. In *A. H. Phillips, Inc.,* v. *Walling,* 324 US 490 (65 S Ct 807, 89 L ed 1095, 157 ALR 876), there was general unity, but that did not prevent the court from holding that the warehouse was an establishment separate from the retail part of the business.

"If, then, these tests standing alone do not suffice, is it a combination of all of them which makes them

* Minnesota Statutes.—Reporter.

sufficient? If 1 is lacking, are the others sufficient, or must they all concur? We believe the better rule to be that these factors, together with other facts, must be taken into consideration in determining whether the unit under consideration is in fact a separate establishment from the standpoint of employment. The St. Paul branch of the Ford Motor Company is highly integrated with other units of the company for purposes of efficient management and operation, but is separate insofar as the employees are concerned for the purpose of employment. The employees are hired and discharged by the St. Paul manager. They are members of a local union which has no connection with the locals at Dearborn, except that all locals are members of the same international, as are many others not connected with the Ford Motor Company. The seniority rights of the employees extend only to operations at the St. Paul plant. No showing has been made, nor do we believe that any can be made, that an employee at the St. Paul branch can 'bump' an employee at the Rouge plant, the Los Angeles plant, the Georgia plant, or anywhere else than at the St. Paul plant. Payment to the Minnesota unemployment compensation fund is made only for employees at the St. Paul plant, and, obviously, benefits can be drawn only by employees in the St. Paul branch from the Minnesota fund. Employment under the act relates to services performed within the State or localized here. The members of Local 879 had nothing to do with calling the strike at the Rouge plant and could do nothing to avert it. While the record does not so show, we assume that under our act the contribution rate of the employer is based on the experience ratio of employees within this State without any regard to the experience in other States.

"Under section 5(d) of the act proposed by the social security board and under our original act, the unit of employment within which the labor dispute must exist in order to disqualify was designated as the *'factory, establishment, or other premises* at

which he is or was last employed.' (Italics supplied.) Under our present act, section 268.09 subd 1(6),* the strike or labor dispute must be in progress 'at the *establishment* in which he is or was employed.' (Italics supplied.) It is doubtful that the change in terminology was intended to enlarge or diminish the unit of employment affecting the disqualification. It has been held that the words 'factory, establishment or other premises' in the Alaska act, which is similar to the Federal act, were *ejusdem generis* and that the principle of *noscitur a sociis* applies. *Aragon* v. *Unemployment Compensation Commission of Alaska* (CCA), 149 F2d 447.

"We are inclined to believe that in our original act the word 'establishment' was intended to include those places of employment which could not be classified as a factory; that in the amendment the legislature concluded that the term 'establishment' was inclusive of factory and all other types of employer units; and that there was no further need to use the word 'factory.' For a discussion of the distinction between factory and establishment, see *General Motors Corporation* v. *Mulquin*, 134 Conn 118 (55 A2d 732).

"The term 'establishment' as used in our amended act should be given no broader meaning than it had in the original act, except that it now includes 'factory' and 'other premises' set out separately in the original act. Our act, patterned after the act proposed by the social security board, is in turn patterned after the British National Insurance Act of 1911 (1 & 2 George V, ch 55, pt 2, § 87), which was amended in 1935 (25 George V, ch 8, pt 3, § 26). Under both the 1911 and the 1935 British acts, disqualification is based upon a work stoppage due to a trade dispute at the *'factory, workshop or other premises'* (italics supplied) at which the claimant is employed.† The British umpire, which is the

---

* Minnesota Statutes (1957).—REPORTER.

† See 16 Halsbury's Statutes of England (2d ed), pp 689 *et seq.*—REPORTER.

final arbiter under the British act, has consistently held that the words 'factory, workshop or other premises' refer to single units of employment. The only substantial change in the language of our original act from the British act was that the word 'establishment' was substituted for 'workshop.' It is difficult to believe that this change was intended to broaden the scope of the employment area so as to encompass a whole industry rather than a single unit of employment." *Nordling* v. *Ford Motor Co.,* 231 Minn 68, 85–89.

For further complications which arise if, as argued to us by appellees, the test of integrated function is primary in definition of "establishment," we make brief reference to *Tennessee Coal, Iron & R. Co.* v. *Martin,* 251 Ala 153 (36 So2d 547). There the employer argued for disqualification of nonstriking members of the United Mine Workers when their coal-mining operations were shut down as a result of strikes by other unions in the steel-making and ore-mining operations of the company. The Alabama supreme court rejected the integration argument, holding (p 158) that the words of their act must be interpreted as "they are commonly used and understood."

While we believe the appeal board and the circuit judge were right in terming the interpretation of the word "establishment" the "pivotal issue" of this case, we believe they were wrong in extending the definition of "the establishment" employed in *Chrysler Corp.* v. *Smith, supra.* Indeed, on the basis of what has been said, we feel constrained to hold that to the extent that *Chrysler Corp.* v. *Smith,* 297 Mich 438 (135 ALR 900), adopted "integral functioning" as the basic test of the extent of "the establishment" in the Michigan employment security act (CLS 1952, § 421.29, subd [1] [Stat Ann 1953 Cum Supp § 17.531, subd (1)]), it is overruled.

The appeal board found, on the point in question, and the circuit judge subsequently affirmed, the following:

"It is our opinion, and we so find, that the unemployment of the claimants in the case at bar was due to and grew out of a stoppage of work existing because of a labor dispute in the establishment in which they were last employed, and that all of the units of the Ford Motor Company, both in Michigan and Ohio, constituted 1 establishment within the meaning of that word as contained in the Michigan act."

For the reasons we have cited, we hold this finding erroneous as a matter of law.

Subsequently, the appeal board turned to the question of whether or not the claimants concerned were "directly interested" in the outcome of the labor dispute under the provisions of subsection 2 of paragraph (b) of section 29(1).

The opinion of the majority of the appeal board, by whose findings of fact we are bound if supported by "the great weight of the evidence" (CLS 1956, § 421.38 [Stat Ann 1957 Cum Supp § 17.540]), accepts the testimony of appellees to the effect that the Canton strike was a part of a union plan to force company concessions upon the master contract, thus affecting the interests of Michigan claimants. While the record indicates that this fact issue was hotly contested, we do not find it necessary to determine whether or not the findings in this regard are supported by the great weight of the evidence.

A reading of section 29(1)(b) indicates clearly that it applies only to disqualification of "an individual" "for any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed."

That there was a stoppage of work is obvious, as is the fact that there was a labor dispute. Plainly, the labor dispute which caused the stoppage was, however, in the Canton forge plant which we have held to be no part of "the establishment" in which claimants were last employed. Michigan claimants, under our act and on this record, cannot be found responsible for that dispute unless we indulge the principal-agent argument previously quoted from the Georgia court which we have rejected.

Further, the basic disqualification finding required in the first sentence of section 29(1)(b) must be legally made before the proviso relating to "direct involvement" becomes effective, and before considering or applying the tests of direct involvement set forth in subsections 1, 2, 3 and 4.

We have considered with care the opinions of this Court on rehearing in *General Motors Corporation* v. *Unemployment Compensation Commission,* 321 Mich 724. The Court there considered the relationship between subsection 4 and subsections 1, 2 and 3 of section 29(1)(b), though in its language the Court did not call attention to the fact to which we now refer (*i.e.,* that none of these subsections become effective for disqualification purposes absent a finding of a stoppage of work existing because of a labor dispute in the establishment in which the claimant is or was last employed). No such reference was required since obviously, in the facts there presented, the basic condition was met.

See, also, *Buzza* v. *Unemployment Compensation Commission,* 330 Mich 223.

It may be, also, that no reference was thought necessary in view of the specific nature of the language of the proviso which precedes subsections 1, 2, 3 and 4:

"(b) For any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed: *Provided, however, that no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute. For the purpose of this section, no individuals shall be deemed to be directly involved in a labor dispute unless it is established:*" (Italics supplied.)

The supreme court of New Jersey, construing similar language in its unemployment compensation act, said:

"The statutory concept is an employment unit within the State, and compensation where the unemployment is involuntary. There is disqualification for benefits under the particular clause only where the unemployment is the result of a labor dispute at the factory, establishment, or other premises where the claimant 'is or was last employed,' and not then if individual nonparticipation is shown as provided in the statute." *Ford Motor Co. v. New Jersey Department of Labor & Industry,* 5 NJ 494, 505.

The proviso and the subsections are plainly designed to allow compensation to some claimants held not "directly involved" under the definitions therein when otherwise they would be disqualified under the terms of the first sentence.

Thus, we hold that the direct interest finding of the appeal board under subsection 2 of section 29(1)(b), even if supported by the great weight of the evidence, does not, standing alone, occasion disqualification.

The last of our questions pertains to the representation issue posed to us in the Dorsey case. In the case of these claims, the Ford Motor Company appeals from a finding of fact entered by the appeal

board holding the appeals valid and a ruling of the circuit judge that the issue was moot because of his denial of all claims on grounds of the "establishment" question.

Appellant Ford Motor on this point contended before the appeal board that the attorney for claimants filed claims of appeal without written or other authority so to do, and that, since the statute* required individual claims and appeals, those in the Dorsey case were invalid.

As to these contentions, the appeal board found:

"It is contended that under the union constitution the international can represent its members only in any matter affecting his status as an employee, and that a labor dispute resulting in the filing of claims for benefits does not fall within the purview thereof. Equally contentious is the claim that the delegation of power contained in the application for membership limits the union to its appearance in the presentation, prosecution, adjustment and settlement of all grievances, complaints, or disputes of any kind or character arising out of the employer-employee relationship.

"We believe this is a restricted view in the light of the statutory provision. The statute authorizes representation by counsel. While the written authorizations do not specifically mention representation in the adjustment of compensation claims, the spirit, intention and language contained therein is sufficiently declaratory of such representation. These claimants were laid off because of a labor dispute growing out of grievances which had been the subject of negotiations over a long period of time. There was a 'dispute' between them and the company affecting the employer-employee status resulting in the filing of claims. It is our opinion that the claimants duly authorized their union, or

---

* See CLS 1952, §§ 421.32 subd (c), 421.32a, 421.33, 421.36 (Stat Ann 1953 Cum Supp §§ 17.534 subd [c], 17.534[1], 17.535, 17.538).

such counsel as it might choose, to represent them as their agent in the processing of their claims. The union selected Mr. Zwerdling, an attorney of repute and a member of the State Bar of Michigan. (It may here be said that this decision relates only to the right of an attorney at law to represent, file appeals and appear for claimants and to no one else.) Mr. Zwerdling thereupon appeared before the commission in person and by correspondence requesting redeterminations, and entered his appearance for the many claimants. Such redeterminations being adverse to the interests of claimants, he processed written appeals in behalf of each of them in his name as their representative, simultaneously entering his appearance as attorney therefor. The fact that a very few claimants determined upon their own representation is of no importance here. The more important fact is that practically all of the claimants have, by their silence, ratified his representation of them. To this date we have learned of no protests. It is argued that because some 5,700 employees signed a certain form published in the union paper 'Ford Facts' expressly authorizing the union to represent them in processing their claims, whereas the claimants herein did not, their appeals to the referee were properly dismissed. In the light of the foregoing it was unimportant whether any of them signed the forms.

"Upon this branch of the case, it is our opinion that the referee erred in dismissing their appeals and his decision is hereby reversed."

The provision from the union constitution as printed on the membership application was:

"I further irrevocably designate, authorize and empower the said union exclusively to appear and act for me and in my behalf before any board, court, committee or other tribunal in any matter affecting my status as an employee, or as a member of said union, and exclusively to act as my agent to represent and bind me in the presentation, prose-

·cution, adjustment and settlement of all grievances, complaints or disputes of any kind or character arising out of the employer-employee relationship as fully and to all intents and purposes as I might or could do if personally present."

We believe the appeals presented in the Dorsey case are valid; but not for the reason given by the appeal board. Under the language of the Michigan employment security act, each claim is an individual case, and must be initiated by the claimant or his representative. The act speaks repeatedly in terms of "an individual" or "a claimant." CL 1948 and CLS 1952, § 421.1 *et seq.* (Stat Ann 1950 Rev and 1953 Cum Supp § 17.501 *et seq.*)

The argument that the paragraph quoted from the union constitution represents a general power of attorney in cases of this nature seems ill-founded to us. Powers of attorney, even when specifically so designated, are strictly construed and cannot be enlarged by construction. *Bergman* v. *Dykhouse,* 316 Mich 315; *Magilavy* v. *Fekete,* 251 Mich 518; *Jeffrey* v. *Hursh,* 49 Mich 31.

This record makes clear that Mr. Zwerdling filed appearance on behalf of these claimants and, under oath, certified that he was attorney for the claimants thus appearing. Under the employment security statute, and the rules of the appeal board, claimants can be represented by counsel. CL 1948, § 421.31 (Stat Ann 1950 Rev § 17.533); Michigan employment security commission appeal board Rule 12 (1954 AC, § R 421.412).

When an attorney enters an appearance in behalf of a party, a presumption arises that the attorney was properly authorized. *Corbitt* v. *Timmerman,* 95 Mich 581 (35 Am St Rep 586); *August* v. *Collins,* 265 Mich 389; 88 ALR 12, 15.

The record discloses that the Michigan employment security commission had promulgated a policy

incorporating this presumption on August 20, 1952.

There is literally nothing in this long record to rebut this presumption. On the contrary, many of the claimants appeared at the hearing before the referee held in Detroit in the main auditorium of the Rackham building. Counsel for the claimants indicated that those present were prepared to testify presumably on this as on other aspects of the dispute. One claimant, Frank H. Depew, apparently called as typical, whose appeal will be governed by our decision in the Dorsey case, testified as follows:

"*Q.* And do you presently want the firm of Zwerdling & Zwerdling to represent you in this case before this referee?"

"*A.* Yes."

The referee at one point stated:

"All of the 11,519 claimants are considered present at this hearing by virtue of the presence of their attorney, Mr. A. L. Zwerdling, the gentleman on my right."

and, at still another point, urged claimants present who had occasion to do so to go to their jobs, assuring them "Your matter will be handled by your attorney."

If there are any of these claimants who did not authorize the filing of an appeal, they certainly are not identified on this record.

We see no occasion to hold these claimants to a requirement of written authorization of counsel not contemplated by the employment security statute, or commission rules, nor for that matter by any statute or rule of any other court in the State of Michigan.

Although the matter is not directly before us, we feel that some reference should be made to the real issue which disturbs the parties and the commission.

The record shows that Mr. Zwerdling was employed and paid by the UAW-CIO to prosecute these appeals and represent these claimants. On this point, the Ford Motor Company calls Canon 35 to our attention:

### "CANON 35. *Intermediaries*

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigents are not deemed such intermediaries.

"A lawyer may accept employment from any organization, such as an association, club or trade organization, to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs."*

In reply thereto, claimants' brief presents the practical problem involved which doubtless moved the employment security commission to take a unanimous stand in favor of indulging a presumption of authorization on an attorney's appearance for a claimant:

"It was the intention of the Federal Congress and the various State legislatures, in enacting unemployment insurance acts, to make proceedings as simple as possible. It was recognized that the claims which would be filed might involve very small

---

* American Bar Association, Canons of Professional and Judicial Ethics and Opinions (1947), p 32. State Bar Rule No 14, 317 Mich xlvi, 351 Mich xv. Honigman, Michigan Court Rules Annotated, p ·818.—REPORTER.

amounts and it would be difficult, if not impossible, to secure legal representation. Take the instant situation, for example. How many of the claimants here could have pursued appeals of their claims for benefits representing periods of between 1 and 3 weeks, possibly involving from $27 to $105, if it were necessary for them to secure direct legal representation or other representation without union assistance? If they had not secured representation, and presented their cases themselves, could they have adequately coped with the complex issues involved?"

Under the disposition we make of this case, we find no occasion to pass on the legal ethics problem presented, but note it as unresolved for the attention of the parties, the employment security commission, and the Michigan State Bar.

For the reasons previously set forth, we feel that the circuit judge should have affirmed the finding of the appeal board holding valid the appeals in the Dorsey case.

In summary, it appears from the opinions filed in this matter that all participating members of this Court are in agreement that the majority interpretation of the words "the establishment" in *Chrysler Corp.* v. *Smith, supra,* was in error and that the interpretation placed thereon by Mr. Justice CARR as trial judge, and adopted by the minority of the Court (p 460) in the *Chrysler Case,* was correct. What divides our Court at this time is not a difference in reading of the statute, but a difference of opinion as to whether or not this Court can correct its own errors.

It is urged upon us that although the interpretation of this statute in *Chrsyler Corp.* v. *Smith, supra,* was wrong, both the length of time which has intervened and legislative failure to alter the statute have

now rendered the error subject to correction only by the legislature.

This doctrine, that silence means consent, has been dealt with eloquently and recently by Mr. Justice SMITH (*Sheppard* v. *Michigan National Bank,* 348 Mich 577, 599, 600, 601), and Mr. Justice VOELKER (*Van Dorpel* v. *Haven-Busch Co.,* 350 Mich 135, 147–153). Judicial history contains many instances where judicial error has been subsequently overruled both by this Court (*Bricker* v. *Green,* 313 Mich 218 [163 ALR 697] ; *Sheppard* v. *Michigan National Bank, supra*), and by the supreme court of the United States\* (*Girouard* v. *United States,* 328 US 61 [66 S Ct 826, 90 L ed 1084] ; *Brown* v. *Board of Education of Topeka,* 347 US 483 [74 S Ct 686, 98 L ed 873, 38 ALR2d 1180]).

In the *Girouard Case* which overruled a line of previous decisions (*United States* v. *Schwimmer,* 279 US 644 [49 S Ct 448, 73 L ed 889] ; *United States* v. *Macintosh,* 283 US 605 [51 S Ct 570, 75 L ed 1302] ; *United States* v. *Bland,* 283 US 636 [51 S Ct 569, 75 L ed 1319]), the majority opinion stated (pp 69, 70) :

"We are met, however, with the argument that, even though those cases were wrongly decided, congress has adopted the rule which they announced. The argument runs as follows: Many efforts were made to amend the law so as to change the rule announced by those cases; but in every instance the bill died in committee.  \*   \*   \*

"We stated in *Helvering* v. *Hallock,* 309 US 106, 119 (60 S Ct 444, 84 L ed 604, 125 ALR 1368), that 'It would require very persuasive circumstances enveloping congressional silence to debar this court from re-examining its own doctrines.' It is at best

---

\* Note illuminating article on this subject, Blaustein & Field, *"Overruling" Opinions in the Supreme Court,* 57 Mich L Rev 151 (December, 1958).

treacherous to find in congressional silence alone the adoption of a controlling rule of law. We do not think under the circumstances of this legislative history that we can properly place on the shoulders of Congress the burden of the court's own error."

Reversed for entry of judgments granting benefits to claimants in both cases. No costs, public questions being involved.

SMITH, BLACK, and VOELKER, JJ., concurred with EDWARDS, J.

KELLY, J., concurred in the result.

DETHMERS, C. J. (*dissenting*). Were this a matter of first impression, I should find myself in agreement with Mr. Justice EDWARDS' interpretation of the word "establishment" as, also, with that in the dissenting opinion in *Chrysler Corp.* v. *Smith,* 297 Mich 438 (135 ALR 900). It seems to me, however, that the majority opinion and decision in that case are conclusive of affirmance here, inasmuch as the facts distinguishing that case from this were not treated as essential to the reasoning and decision there. That case was decided in 1941. Since then, the statute and the particular section here in question have been amended several times, but never has the legislature adopted any amendment indicating legislative dissatisfaction with this Court's construction, in *Chrysler,* of the term "establishment." Where a statutory provision is re-enacted without change in language, it must be presumed that the action was taken in the light of prior judicial construction placed upon it and with the intent to adopt such construction. *Van Antwerp* v. *State,* 334 Mich 593. When the Supreme Court has placed an interpretation on a statute over a considerable period of years it may indulge the judicial assump-

tion that the legislature has been content with that interpretation in view of its failure to exercise its independent prerogative to restate the provision. *Twork* v. *Munising Paper Co.*, 275 Mich 174, 178.

"In *In re Clayton Estate*, 343 Mich 101, 107, this Court quoted with approval the principle enunciated in 21 CJS, Courts, § 214, pp 388, 390, as follows:

" ' "The doctrine of *stare decisis* applies with full force to decisions construing statutes or ordinances, especially where the construction has been long-acquiesced in. * * *

" ' "This rule is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature, by its continued use or failure to change the language of the statute so construed, *the power to change the law as interpreted being regarded, in such circumstances, as one to be exercised solely by the legislature.*" ' * * *

"To grant the relief requested by the plaintiff would require this Court to exercise legislative prerogatives." (Emphasis supplied.) *Consumers Power Co.* v. *County of Muskegon*, 346 Mich 243, 250, 251.

See, also, cases to same effect from other jurisdictions, cited in *In re Clayton Estate*, 343 Mich 101. For these reasons, I would affirm the judgment of the circuit court.

Carr, J., concurred with Dethmers, C. J.

Black, J. (*concurring in reversal*). The majority opinion of *Chrysler Corp.* v. *Smith* (1941), 297 Mich 438 (135 ALR 900), looks in vain for a defender around our conference table. No one here is quite so bold as to do it reverence. Yet the Chief Justice would have us consecrate—and so perpetuate—the

tragic and now conceded* blunder made by *Chrysler's* majority when the statutorily-employed word "establishment" was construed, over sharp and unerring dissent, in such manner as to deny unemployment benefits to thousands of industrial employees; employees we now know were rightfully entitled to such benefits.

Admitting that *Chrysler's* minority was and is right, the Chief Justice interposes the perennially debated rule of *stare decisis*—in its most extreme and wholly discredited form of judicial self-stultification—as a pronounced bar to correction by this Court of its so confessed error. In plain bread and butter words, the asserted position amounts to no more than this: Because, in 1941, an irreparable injustice was committed by the Court against a multitude of Chrysler employees—the legislature since having remained disinterested in correction by its hand of our grievous misinterpretation at that time,—the Court in 1959 must equally oppress thousands more of correspondingly situated Ford employees; indeed, must continue such oppression in future like cases until the legislature directs otherwise. Thus rudely denuded, we behold the altiloquent notion that *stare decisis* renders judicial error—of statutory interpretation—frozen-final so

---

* Our admission that *Chrysler's* majority erred is fully chronicled with release of present opinions. In the first instance Mr. Justice CARR, then the circuit judge whose decision was reviewed in *Chrysler*, reasoned with *Chrysler's* minority that "plaintiff's (Chrysler) different plants *must* be *regarded as separate establishments* insofar as the application of section 29, subd (d) is concerned." Now, by the opinion he has proffered for signature in the cases before us, the Chief Justice says—"Were this a matter of first impression"—he would find himself in agreement with *Chrysler's* minority. Finally, 4 more members of the Court as now composed have agreed that *Chrysler's* majority dialectic (that all involved units of Chrysler Corporation "constitute one 'establishment' within the meaning of that term as employed in the act") should at long last be set right. (See above opinion of Mr. Justice EDWARDS.) Thus our confession of *Chrysler's* mistake, if not exactly hearty, so far stands unopposed in these chambers.

far as the errant appellate court is concerned. Needless to say, we reject both the notion and its disreputable postulates.

This disputed ground has recently been fought upon, inconclusively so far, by our divided membership. In *Sheppard* v. *Michigan National Bank,* 348 Mich 577, 596–603, Mr. Justice Smith—supported by Justice Voelker and the writer—hewed the reasoned and authoritative answer to this proposition that a court of last resort has but one fateful and irretrievable opportunity to construe a standing statute. In the next ensuing term the issue was skirmished again, this time to a 4–4 draw. See *Van Dorpel* v. *Haven-Busch Co.,* 350 Mich 135, 145–155, wherein Mr. Justice Voelker, supported by Justices Smith and Edwards and the writer, seized and shook "this beguiling doctrine" (that if a legislature "delay long enough to correct our errors those errors thus become both respectable and immutably frozen") and found that it amounted to outright abdication of judicial responsibility and a fast pass of duty-buck to a coy and wary legislature. It is time that this unseemly duel be brought to an end, and so it is ordained by majority signature this day of Mr. Justice Edward's foregoing opinion; an opinion which definitely commits this Court to the not-so-formalistic view of *stare decisis* one finds in the above identified opinions of Justices Smith and Voelker.* More should be said, though, lest our interpretation of the doctrine of *stare decisis* (as

---

* Note how *Arrow Builders Supply Corp.* v. *Hudson Terrace Apartments, Inc.,* 15 NJ 418 (105 A2d 387), cited and quoted by Mr. Justice Voelker in *Van Dorpel* at pages 150–152, has brought about a recent recast of the text of American Jurisprudence (see 14 Am Jur, 1958 Cum Supp, Courts, § 66, p 47). The text, citing *Arrow,* is now decidedly modified as follows:

"The principles of *stare decisis* and legislative acquiescence in the judicial interpretation of statutes are not absolute, however, and must give way to overriding considerations under cogent circumstances."

applied to the cases now here) be construed in some eager quarters as complete disregard of a judicial rule which, in its proper setting of discretionary application, the undersigned have always respected and continue to respect.

In these early days of 1959, no member of this Court may pretend unawareness of the stark fact that the philosophic debate shown in *Sheppard* and *Van Dorpel* has boiled to high temperature at national jurisprudential levels. From the current "outburst of criticism" one naturally would gather that discretionary, distinguished from monolithic, application of *stare decisis* is something new and repugnant to proper judicial conduct; that the practice threatens our liberties and free institutions, and that legislation (by constitutional amendment or otherwise) is necessary to curb present-day appellate judges whose view of *stare decisis* is not that of rigid adherence to the formulas of former adjudication (see "The Supreme Court Must Be Curbed," U. S. News and World Report, May 18, 1956, p 50; "A Court Under Fire," U. S. News and World Report, March 21, 1958, p 58; "Supreme Court: A Critical Look by State Justices," U. S. News and World Report, August 29, 1958, p 62; "What a State Chief Justice Says About the Supreme Court," U. S. News and World Report, December 12, 1958, pp 88–93, and the "Crusade" of Dozier A. De Vane, "until recently chief judge of the U. S. District Court for Northern Florida," U. S. News and World Report, December 26, 1958, p 67). Now let us examine this "outburst" in the light of that which surely was respectable in the known days of judicial respectability.

In 1910, long before such outburst was manufactured and launched, the following levelheaded definition of *stare decisis* appeared in the official re-

ports (*Hertz* v. *Woodman,* 218 US 205, 212 [30 S Ct 621, 54 L ed 1001]) :

"The rule of *stare decisis,* though one tending to consistency and uniformity of decision, is not inflexible.  Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided."

In 1932 Mr. Justice Brandeis recorded his enduring epigram that *"Stare decisis* is not, like the rule of *res judicata,* a universal, inexorable command."  (*Burnet* v. *Coronado Oil & Gas Co.,* 285 US 393, 405 [52 S Ct 443, 76 L ed 815].)  From that point, and having approvingly quoted *Hertz'* rule as above, the Justice went on to say:

*"Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right.  Compare *National Bank* v. *Whitney,* 103 US 99, 102 (26 L ed 443, 444).  This is commonly true even where the error   is a matter of serious concern, provided correction can be had by legislation.*  But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions. The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." (pp 406–408 of *Burnet's* report.)

In *Helvering* v. *Hallock,* 309 US 106, 119–121 (60 S Ct 444, 84 L ed 604, 125 ALR 1368), the Court came to grips with today's identical controversy. Having found an earlier rule of statutory construc-

---

* Here, as footnote 1, Justice Brandeis listed a number of authorities in support of this terse explanation: "This Court has, in matters deemed important, occasionally overruled its earlier decisions although correction might have been secured by legislation."

tion quite untenable, the court was immediately confronted by a contention that congress, having failed to correct the court's error, had perforce ratified that error and thus had rendered it immune from judicial correction. The court (pp 119–122) said (Justices Roberts and McReynolds dissenting):

"We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience. * * *

"Nor does want of specific congressional repudiations of the *St. Louis Union Trust Cases*\* serve as an implied instruction by congress to us not to reconsider, in the light of new experience, whether those decisions, in conjunction with the *Klein Case*,† make for dissonance of doctrine. It would require very persuasive circumstances enveloping congressional silence to debar this court from re-examining its own doctrines. To explain the cause of nonaction by congress when congress itself sheds no light is to venture into speculative unrealities. * * * Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of the treasury and of congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.

"This court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction. * * * The real problem is whether

---

\* *Helvering* v. *St. Louis Union Trust Co.*, 296 US 39 (56 S Ct 74, 80 L ed 29, 100 ALR 1239); *Becker* v. *St. Louis Union Trust Co.*, 296 US 48 (56 S Ct 78, 80 L ed 35).—REPORTER.

† *Klein* v. *United States*, 283 US 231 (51 S Ct 398, 75 L ed 996).— REPORTER.

a principle shall prevail over its later misapplications. Surely we are not bound by reason or by the considerations that underlie *stare decisis* to persevere in distinctions taken in the application of a statute which, on further examination, appear consonant neither with the purposes of the statute nor with this court's own conception of it."

Here, then, is our contributed view that *stare decisis* is a discretionary rather than obstinate rule of judicial conduct. Fairly analyzed, it declares that appellate courts should adhere to precedent save only when due consideration leads to firm conviction that the earlier decision or decisions in scrutiny are wrong as well as unjust, and that more rather than less injustice will flow from perpetuation of that which is found erroneous.

Those rare cases, usually involving the law of property, where the litigant citing an earlier decision or decisions is shown as having acted in reliance thereon,* have not been overlooked. In such instance the Court, having determined to overrule, may make its overruling decision prospective in effect (*Donohue* v. *Russell,* 264 Mich 217; followed in *Metzen* v. *Department of Revenue,* 310 Mich 622, 629, and *Gentzler* v. *Constantine Village Clerk,* 320 Mich 394, 398). In these cases of Park and Dorsey, there is and could be no such claim that the employer—or any interested party—acted or proceeded in any way on strength of *Chrysler's* ill-starred majority opinion.

We would advert to a further test of that which is pleaded in bar of *Chrysler's* rejection. Michigan reports of the past 2 decades disclose curious disinterest in this doctrine of legislative ratification

---

* "The picture of the bewildered litigant lured into a course of action by the false light of a decision, only to meet ruin when the light is extinguished and the decision overruled, is for the most part a figment of excited brains." (Mr. Justice Cardozo in The Growth of the Law, p 122.)

of judicially announced interpretation of a statute when the shoe of interpretation is on the other foot. Why, when original liberal constructions of Michigan's other great remedial statute (the workmen's compensation act) were regularly being repudiated here in favor of noose-tightening constrictions of the same unamended statutory provisions, did some Justice not rise to point out that a quiescent and acquiescent legislature had approved the original interpretation or interpretations and so had left the Court powerless to do other than follow its earlier precedents? A perfect example of this failure will be found in the rough life—between *Luteran* in 1946 and *Dyer* in 1957\*—of *Haller* v. *City of Lansing,* 195 Mich 753 (LRA1917E, 324), and *Brink* v. *J. W. Wells Lumber Co.,* 229 Mich 35. *Dyer* tells the story this way:

"*Haller* (1917) and *Brink* (1924) were written into our reports by distinguished predecessors composing the so-called Fellows Court. Presumably, they knew more about the background and intended scope of the pivotal phrase—'arising out of and in the course of his employment,'—found in original and present section 1 of part 2 of the workmen's compensation act, than we do. The Court members of that day 'were there,' as the saying goes, and they tell us through *Haller* and *Brink* of original and steadfast legislative will that such phrase extend its protective range to a reasonable time and space for the employee to approach and leave the locality or zone of his work." (p 95)

"With changes of personnel here, unfortunate changes of interpretive thought reared themselves. No intervening amendment of the statute brought this about. Inapposite yet contagious notions re-

---

\* The references are to *Luteran* v. *Ford Motor Co.,* 313 Mich 487 and *Dyer* v. *Sears, Roebuck & Company,* 350 Mich 92.

corded in *Daniel, Hickman* and *Pilgrim**—imported from Massachusetts and renounced this day in *Freiborg* v. *Chrysler Corporation,* 350 Mich 104,—descended unnoticed on *Haller* and *Brink* and resulted finally in flat repudiation of both." (p 94)

*Haller* (as noted with detail in *Mack* v. *Reo Motors, Inc.,* 345 Mich 268, 278–280) once was "a leading case in this country;" yet it was too liberal an interpretation of said section 1 for the composition of the Court as it stood between 1946 and 1956. So *Haller,* having first been questioned in *Luteran* and then airily cast aside in *Hickman* v. *City of Detroit,* 326 Mich 547, 550, was finally overruled† with no word—then or at any other time—for legislative "acquiescence" in *Haller's* construction of said section 1; a construction which had governed relevant application and administration of said section 1 for at least 29 years.

Are we to understand, from all this, that the asserted aphorism of legislative ratification applies only when the decision to overrule results in a more liberal interpretation of the once-interpreted statute? Let there be forthright answer. For our part the doctrine is and will be recognized only for what it has always been, that is to say, legislative acquiescence is but one of the many considerations by which an appellate court arrives at a determination to follow or overrule an earlier precedent of challenged and doubtful validity. It is a persuasive but

---

* *Daniel* v. *Murrary Corporation of America,* 326 Mich 1; *Hickman* v. *City of Detroit,* 326 Mich 547; *Pilgrim* v. *Menthen,* 327 Mich 714.— REPORTER.

† Our majority said at the time (*Mack* v. *Reo Motors, Inc.,* 345 Mich 268, 288):

"In view of the many decisions of this Court since the *Haller Case* was decided in 1917, it is apparent that the *Haller Case* has been effectively overruled by the subsequent *Luteran Case* and many others, and that the *Haller Case* has gone 'to the mat of discard'."

not necessarily controlling factor and, in the language of text-amended American Jurisprudence, "must give way to overriding considerations under cogent circumstances." Such overriding considerations are definitely present at this sitting, and no member of the Court is willing or able to defend that which we now overrule.

To conclude: In his opinion Mr. Justice EDWARDS has appropriately referred to the thoroughly considered and painstakingly documented thesis appearing in current issue of Michigan Law Review (57 Mich L Rev, December, 1958, p 151 *et seq.*). There the reader will find proof that *stare decisis* has never been allowed to stand in the way of necessary and righteous correction of the judicial process by judicial process, and that self-reversal has taken place by order of distinguished judges from as far back as the time of John Marshall. The title is " 'Overruling' Opinions In The Supreme Court." It lends to this opinion an appropriate conclusion (p 183):

"Here  *  *  *  is a discussion of the judicial discretion which leads to overrulings, and a presentation of some of the criteria which determine when the exercise of that discretion was 'necessary,' 'justified' or possibly 'unwarranted.'

"Here also is a plea for more definite and expressed overrulings—and a plea for the proposition that it is 'the duty of every judge and every court to examine its own decisions,  *  *  *  without fear, and to revise them without reluctance.' For there is nothing wrong with a public confession of error. It is, of course, far more important that the Supreme Court be right than that it be consistent. It is far more important that the law be definite than that discredited and outmoded doctrine be permitted to survive."

By these presents we concur unreservedly in the foregoing opinion of Mr. Justice EDWARDS.

SMITH and VOELKER, JJ., concurred with BLACK, J.

KAVANAGH, J., did not sit.